**ROSES, INCORPORATED, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Asociacion Colombiana de Exportadores de flores et al., Intervenors–Defendants.**

**Court No. 84–10–01371.**

United States Court of International Trade.

Aug. 18, 1989.

See also, 682 F.Supp. 577.

Arnold & Porter, Alan O. Sykes and Dan Esty, and Heron, Burchette, Ruckert & Rothwell, Thomas A. Rothwell, Jr., James M. Lyons and William E. Donnelly, Washington, D.C., on the brief, in opposition, for intervenors-defendants.

## OPINION

AQUILINO, Judge:

This and two other actions between the same parties, CIT Nos. 84–08–01215 and 84–10–01447, which arise out of an anti-dumping investigation of fresh cut roses from Colombia, have been reassigned to me for disposition. In this action, the plaintiff has interposed a motion for judgment upon the record compiled by the U.S. International Trade Commission ("ITC") in reaching its final determination that an industry in the United States is not materially injured, or threatened with material injury, by reason of the rose imports investigated. 49 Fed.Reg. 36,712 (Sept. 19, 1984); USITC Pub. 1575 (Sept. 1984).

### I

After the International Trade Administration, U.S. Department of Commerce had published *Fresh Cut Roses From Colombia; Final Determination of Sales at Less Than Fair Value*[1], the ITC, by a vote of three to one, reached the final negative injury determination[2] at issue herein. The views of the majority are summarized as follows:

> Imports of fresh cut roses from Colombia have had no material impact on the domestic industry, in spite of a sharp increase in imports during January 1981–March 1984, the period under investigation. The domestic industry is in a healthy condition; domestic production, shipments, profits and productivity have all increased. Further, the increase in U.S. consumption more than accounts for the increase in imports from Colombia. Average prices for domestic roses also

Stewart and Stewart, Eugene L. Stewart and Terence P. Stewart, Washington, D.C., for the plaintiff.

Office of Gen. Counsel, U.S. Intern. Trade Com'n, Lyn M. Schlitt, James A. Toupin and Judith M. Czako, Washington, D.C., for defendant.

1.  49 Fed.Reg. 30,765 (Aug. 1, 1984). This final determination is the focus of the actions docketed under CIT Nos. 84–08–01215 and 84–10–01447.

2.  One commissioner did not participate in the determination. *See* Pub. 1575 at 1, n. 2.

increased steadily. Although in some instances the imported roses from Colombia have undersold domestic roses, in a number of instances, the imported roses from Colombia oversold domestic roses on a delivered basis. Potential increases in imports from Colombia present no threat of material injury to the domestic industry because the industry has exhibited the strength to withstand import competition, and the projected increase in imports is small relative to the domestic market and past increases. Pub. 1575 at 3.

The commissioner in dissent determined a threat of material injury to the domestic industry to exist, based on the following approach:

> ... First, imports of roses from Colombia are increasing at an accelerating rate both in volume and in the share of the U.S. market they command. Second, recent expansion of Colombian production capacity is just beginning to affect the domestic market. Finally, because of the special nature of the product which is the subject of this investigation, the effect of mounting competition from LTFV imports from Colombia will be material injury to the domestic industry which is already showing signs of strain. Pub. 1575 at 13.

## II

■ This action has been brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(ii). Jurisdiction is based on 28 U.S.C. § 1581(c). The plaintiff has submitted a voluminous brief in support of its motion for judgment on the record which contests, for the most part, the ITC majority's views of the evidence gathered during the investigation. The plaintiff argues that the Commission "ignored pertinent facts of record"[3] and

> based its decision upon erroneous data contained in the ... staff report which in part were the result of mathematical and

conceptual errors, and in part failed to include all of the corrected responses to the Commission's questionnaire submitted by domestic rose growers....[4]

The plaintiff has sought to buttress its viewpoint by submitting as an appendix to its brief some 228 printed sheets purporting to "correct" the data. The defendant argues that the court should disregard them as not being part of the agency record. However, after consideration of their contents and comparison with the record, the court finds the appendix to be within the realm of permissible argument in support of judicial review.

The standard prescribed by statute for such review of a final ITC determination is whether it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). The record is to be reviewed for "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). And in doing so, the

> views of this court may not be freely substituted for those of ITC; nor may reversal be predicated solely on an interpretation of the facts that seems more reasonable. Only if ITC's determination is not supported by substantial evidence, or if it was reached in a manner contrary to law, may it be overturned.[5]

That law, 19 U.S.C. § 1677(7)(B) (1982), required the Commission to consider, among other factors—

> (i) the volume of imports of the merchandise which is the subject of the investigation,

> (ii) the effect of imports of that merchandise on prices in the United States for like products, and

> (iii) the impact of imports of such merchandise on domestic producers of like products.

---

**3.** Plaintiff Roses, Incorporated's Brief in Support of its Motion for Judgment on the Agency Record ("Plaintiff's Brief"), p. 60.

**4.** *Id.* at 103.

**5.** *USX Corp. v. United States,* 11 CIT ——, ——, 655 F.Supp. 487, 489 (1987).

Subsection (C) of section 1677(7) added the following:

(i) *Volume.*—In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) *Price.*—In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

(iii) *Impact on affected industry.*—In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices, and

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

No one of the foregoing factors is necessarily dispositive of the question of material injury. The ITC is obligated to weigh all the pertinent evidence gathered in an investigation in reaching a determination. *E.g., SCM Corp. v. United States,* 4 CIT 7, 13, 544 F.Supp. 194, 199 (1982).

With regard to the volume of imports, the ITC majority conceded that it had "in-

creased substantially". Pub. 1575 at 7. However, the commissioners found U.S. consumption rose during the review period at a pace twice that of import volume, and the expanding market was thus able to absorb substantially the import increase while, at the same time, spurring domestic production.

Undercutting was found in 62 of 110 delivered price comparisons, at an average of 20 percent, while 43 comparisons reflected overselling of the Colombian imports, by an average of approximately 18 percent. Many of the instances of undercutting were explained, however, by the fact that locally-grown roses carried price premiums based on freshness and an ability of growers to supply the flowers on a short-term need basis. *See* Pub. 1575 at 9–10. Those who reported price-comparison data generally indicated they had purchased imports as a complement to, rather than a substitute for, their domestic purchases, usually during times of shortfalls in the domestic supply. *See id.* at 9, n. 27, citing staff report at A–41 and A–114 to A–115.

The data submitted by the growers covered two varieties of rose, hybrid tea and sweetheart. The former variety accounted for 75 percent of the domestics' data and almost all of the imports, while the remaining domestic 25 percent was for sweetheart roses. The ITC concluded that the imports did not depress domestic prices. *See id.* at 7–8. The data reflected an industry where wholesalers purchased 70 percent of the domestic producers' output and almost 100 percent of the imports, and "[d]omestic rose growers' selling prices of both hybrid tea and sweetheart roses sold to wholesale florists generally increased in the January–March periods of 1982–84 and in the full-year period of 1983...." *Id.* at A–34. Price comparisons at the retail level, on the other hand, were mixed. Domestic sweetheart-rose prices increased in both annual and first-quarter comparisons [6], while hybrid-tea-rose prices went up annually,

---

**6.** The ITC determined that the "January–March period is the period of the year when rose growers sell most of their production in terms of dollar value ... [and] are able to command the highest prices because of high demand resulting from such holidays as Valentine's Day." Pub. 1575 at 8, n. 21.

though declining slightly in the first quarters. The Commission majority was not impressed by this fact, concluding that the lack of head-to-head competition between the domestics and the imports in the retail hybrid-tea-rose market could not directly affect domestic pricing patterns. *See id.* at 8.

At oral argument, the plaintiff acknowledged that "the ITC may not rely [up]on isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." Transcript at 24, quoting *USX Corp. v. United States,* 11 CIT ——, ——, 655 F.Supp. 487, 489 (1987). Whatever its precise weight, there is substantial evidence on the record to support the ITC's conclusion that the domestic industry was sound during the period of investigation. Domestic production and sales increased during that time, as did the dollar value of those sales when measured both in the aggregate and on a unit basis. The investigation disclosed that more square footage was devoted to domestic production, with an increase in the average yield per plant, despite a decrease in the number of plants in production. While employment of production and related workers slumped somewhat, their productivity increased, as did salaries. Net income before taxes increased each year, measured annually, and, while the first-quarter 1984 breakdown revealed a decline in pre-tax net income, domestic growing expenses, increasing at a rate twice that of sales, helped account for this fall-off. Reported lost sales, as confirmed by the staff, represented a small percentage of the Colombian imports, with many buyers citing non-price reasons for purchasing them.

The plaintiff argues that the real health of the domestic industry was masked by the ITC's failure to break down separately the data by rose variety, or by geographic producer sector (*e.g.,* eastern versus California), and by its reliance on domestic

financial information on an annual, rather than quarterly, basis. As presented, plaintiff's position is one which would necessitate judicial reweighing of the evidence to take into account the factors and approach it favors, but this court is not at liberty to reweigh evidence in an action such as this.

### III

■ An affirmative injury determination by the ITC pursuant to 19 U.S.C. § 1673d(b)(1) requires both the existence of material injury, or threat thereof, to an industry in the United States and a causal connection between such injury or threat and imports determined to be sold at less than fair value. *E.g., American Spring Wire Corp. v. United States,* 8 CIT 20, 23, 590 F.Supp. 1273, 1276 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (Fed.Cir.1985). Not only did the majority not find material injury, the commissioners concluded that "any injury suffered by the domestic rose growers was not caused by imports of Colombian roses." Pub. 1575 at 10.

Be that as it may, as indicated above the majority also reached a negative determination on the question of threat of material injury. That conclusion, of necessity, is more problematic on the record at hand, as discussed by the dissent. Indeed, just after the final determination was published, Congress enacted the Trade and Tariff Act of 1984, Pub.L. No. 98–573, which set forth, among other provisions, "relevant economic factors" to be considered on the threat issue [7]—upon legislative recognition that "the projection of future events is necessarily more difficult than the evaluation of current data." [8] In any event, at the time of the determination herein, the ITC was to "consider any economic factors it deems relevant, and consider the existing and potential situation with respect to such factors." [9] Section 207.26 of title 19,

---

7. *See* 19 U.S.C. § 1677(7)(F).

8. H.R.Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984). That report also states that the "purpose of the threat provision is to prevent actual material injury from occurring."

9. S.Rep. No. 249, 96th Cong., 1st Sess. 88 (1979). *Cf.* H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979) ("in considering threat, high present capacity utilization of the domestic industry and the absence of other indicia of present injury

C.F.R. listed the following points to be considered:

(1) The rate of increase of subsidized or dumped exports to the U.S. market;

(2) Capacity in the exporting country to generate exports; and

(3) The availability of other export markets.

In considering such factors, however, Congress has mandated that any perceived threat be real and actual injury imminent. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 88–89 (1979), U.S.Code Cong. & Admin. News 1979 pp 381, 475–476; 19 U.S.C. § 1677(7)(F)(ii).

The staff report disclosed increases in Colombian production and in U.S. imports. Moreover, information obtained by the investigators indicated that by 1986 additional millions of blooms would be available for export to the United States, as compared with the 1983 level. The ITC's conclusion that a real threat of actual injury was not imminent was predicated on an assumption that every one of the additional blooms would be exported to the United States, but, even with a possible annual increase of ten million, the majority determined a decline in the rate of import growth when compared to that for the period of investigation. During that time, when the market experienced greater increases in imports and losses of domestic share, consumption also increased, with concomitant annual rises in production, prices, sales and profits on the part of the domestic industry.

While reasonable minds can disagree as to the import of these and other record facts for the future, the court cannot conclude that they are too insubstantial within the meaning of 19 U.S.C. § 1516a(b)(1)(B) to support the ITC's determination that the domestic rose industry was not faced with imminent threat of material injury by reason of the Colombian imports.

## IV

A hearing held by the ITC provided the petitioner with an opportunity to present sworn statements from domestic rose growers on lost sales, operating expenses, and price suppression and depression. The plaintiff now argues that this information was given insufficient consideration, claiming the "testimony was largely ignored in the staff report ... and in the views of the majority, who referred to it in a single instance in a footnote...." Plaintiff's Brief at 61. However, the law does not require a written response by the ITC to all points made by parties before it. *E.g., British Steel Corp. v. United States,* 8 CIT 86, 98, 593 F.Supp. 405, 414 (1984). A presumption exists that the commissioners consider all the evidence in making their determinations, and the burden is on the plaintiff to make a contrary showing. *E.g., Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 55, 592 F.Supp. 1318, 1326 (1984). Here, the plaintiff has failed to persuade this court that the Commission neglected to consider all relevant proferred information during its deliberations.

The court has reviewed the sheets of "corrected" data submitted by the plaintiff in the appendix to its brief and which allegedly expose errors committed by the ITC staff. New compilations are presented from questionnaire data for some 163 domestic growers. However, plaintiff's presentation is not conclusive that any errors are "so gross as to invalidate the ... [ITC's] analysis or the conclusions following from it" [10], particularly where, as here, the Commission relies on a supportable view of the industry as a whole.

This being the case, the court concludes that the challenged ITC negative final determination is supported by substantial evidence on the record and otherwise in accordance with law. Plaintiff's motion for judgment on the agency record must therefore be denied.

Judgment will enter accordingly.

---

should not be considered as conclusive as to the absence of threat of injury").

**10.** *Gifford–Hill Cement Co. v. United States,* 9 CIT 357, 372, 615 F.Supp. 577, 588 (1985).