**DASTECH INTERNATIONAL, INC.; ICC Industries Inc.; Sinochem (USA), Inc.; Guangdong Chemicals Import & Export Corp.; Sinochem Jiangsu Import & Export Corp.; Sinochem International Chemicals Co., LTD. Tianjin Chemicals Import & Export Corp. Plaintiffs,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION, Defendant,**

and

**Union Camp Corp., Defendant–Intervenor.**

**Slip Op. 97–52.**
**Court No. 94–08–00467S.**

United States Court of International Trade.

May 1, 1997.

Williams, Mullen, Christian & Dobbins, P.C., William E. Perry, Washington, DC, for Plaintiffs.

Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, Andrea C. Casson, Office of the General Counsel, United States International Trade Commission, Washington, DC, for Defendant.

Fenwick & West, Roger M. Golden, Phyllis E. Andes, Washington, DC, for Defendant–Intervenor.

## OPINION

WALLACH, Judge:

In this case, the court is called on to decide the particularity with which the International Trade Commission ("ITC") must explain its affirmative finding of a threat of injury to a domestic industry in an antidumping investigation. This matter is before the

court on a motion for judgment upon an agency record, pursuant to USCIT Rule 56.2, brought by Dastech International, Inc., and other Chinese exporters and United States importers of sebacic acid (collectively, "Dastech"). Dastech challenges the finding of a threat of injury to a domestic industry made by the ITC in *Sebacic Acid From the People's Republic of China,* Inv. No. 731–TA–653 (Final), USITC Pub. No. 2793 (1994) (the "Determination"), contending that the determination should be remanded primarily because the ITC majority failed to consider certain facts in the record. The court disagrees for the following reasons, and dismisses the action.

## I. BACKGROUND

On July 19, 1993, Union Camp Corporation ("Union Camp") filed a petition with the Department of Commerce ("Commerce") and the ITC alleging that sebacic acid from the People's Republic of China ("PRC") was being dumped in the United States, injuring the American sebacic acid manufacturing industry. Commerce made a final determination that sebacic acid indeed was being sold in the United States at less that fair market value on May 31, 1994. *Sebacic Acid From the People's Republic of China,* 59 Fed.Reg. 28,053.

On July 5, 1994, the ITC promulgated its final injury determination, finding a threat of material injury to the American industry, based on a 3–2 vote [1], but no present material injury. Determination at pp. I–3, I–Il. Commerce published an antidumping duty order on July 14, 1994. *Antidumping Duty Order: Sebacic Acid From the People's Republic of China,* 59 Fed.Reg. 35,909.

This action was severed from consolidated actions brought by Dastech and Union Camp which challenged Commerce's determination in the sebacic acid investigation as well as the ITC's determination. The two actions were heard *seriatim* by the court. Its opin-

ion in the Commerce-related action appears at USCIT Slip Op. No. 96–123 (Aug. 5, 1996); this is its opinion in the ITC-related action.[2]

## II. STANDARD OF REVIEW

 The court's inquiry is circumscribed by the deference that it must accord the ITC's determination. Congress has directed the CIT to review ITC determinations of a threat of material injury to ascertain whether they are unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988); *Suramerica de Aleaciones Laminadas, CA. v. United States,* 44 F.3d 978, 982 (Fed.Cir.1994). Substantial evidence on the record means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988) (citation omitted). Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *E.g., Granges Metallverken AB v. United States,* 13 CIT 471, 475, 716 F.Supp. 17, 21 (1989) (citations omitted).

 Affirming a particular conclusion "is not necessarily inconsistent with a holding that the opposite conclusion was also supported by substantial evidence and otherwise in accord with law." *Trent Tube Div. v. Avesta Sandvik Tube AB,* 975 F.2d 807, 814 (Fed.Cir.1992). Consistent with this standard, the court may not reweigh the evidence, or substitute its judgment for that of the ITC. *Granges Metallverken,* 13 CIT at 474, 716 F.Supp. at 22. The court does not act on whether it believes the Commission's determination to be correct, but rather whether the determination is unfounded or legally defective.

 Despite the deference that this court must give the ITC's determination the

1. One commissioner found a present material injury to the U.S. industry. Determination at p. I–3.

2. The government and Union Camp joined in a motion to strike portions of Dastech's initial brief that contained facts that occurred after the ITC

issued its determination. Dastech has indicated that it does not contest the motion. Therefore, the court has stricken the offending parts of the brief and has not considered them in rendering this decision.

court's review is neither passive nor powerless:

A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Aktiengesellschaft v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935–36, 19 L.Ed.2d 1090 (1968).

*Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 850 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

### III. DISCUSSION

■ Plaintiff contends that the ITC failed to consider certain evidence in the record, and that this failure renders the Commission's decision unsupported by substantial evidence in the record and contrary to law. The ITC and Union Camp respond that Dastech offers no cognizable proof that the ITC failed to consider all the evidence in the record, and that Dastech in truth is asking the court to reweigh the evidence, which is, of course, impermissible.

### A. THE STATUTE GOVERNING THE ITC'S INVESTIGATION

It is useful to begin with the statute that governs the ITC's actions. The ITC's determination of threat of injury is governed by 19 U.S.C. § 1677(7)(F) (1988), which sets forth the economic factors that the Commission must consider in investigating such a threat. The statute states:

In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the merchandise, the Commission shall consider, among other relevant factors—

(I) if a subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the subsidy is an export subsidy inconsistent with the Agreement),

(II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,

(III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,

(IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,

(V) any substantial increase in inventories of the merchandise in the United States,

(VI) the presence of underutilized capacity for producing the merchandise in the exporting country,

(VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury,

(VIII) the potential for product-shifting if the production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 1671 or 1673 of this title or to final orders under section 1671e or 1673e of this title, are also used to produce the merchandise under investigation,

(IX) in any investigation under this subtitle which involves imports of both raw agricultural product ... and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both)

(X) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the like product.

19 U.S.C. § 1677(7)(F)(i) (1988).

Of the foregoing factors, numbers I, VIII and IX are not applicable here because (I) there is no subsidy at issue, (VIII) sebacic acid production facilities are so highly specialized that there is no possibility of product shifting, and (IX) there are no agricultural products, raw or processed, at issue here. Determination, fn 77 at p. I–11–12.

It is also important to note that the list of factors is not exhaustive. The statute calls on the ITC to consider the enunciated criteria "among other relevant economic factors", 19 U.S.C. 1677(7)(F)(i) (1988), thus requiring the ITC to look beyond the specified economic factors to "any other factors that tend 'to make the existence of a [threat of material injury] more probable or less probable than it would be without the [factors].'" *Suramerica*, 44 F.3d at 983, quoting Fed.R.Evid. 401 (defining relevance). In *Suramerica*, the Federal Circuit found mandatory ITC consideration of all relevant economic factors in a threat determination, unlike a determination of actual injury, in which consideration of economic factors other than those enumerated in the statute is discretionary. *Id.;* 19 U.S.C. § 1677(7)(B)(ii) (1988).[3]

In reviewing all the economic factors material to its threat determination, the ITC is required to base its determination on the entire administrative record. A determination that a threat exists "shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition." 19 U.S.C. § 1677(7)(F)(ii) (1988).

## B. ITC'S THREAT OF INJURY DETERMINATION

The ITC prepared a three-page explanation of the majority's determination that the United States sebacic acid industry is experiencing a threat of material injury by reason of imports from the PRC. Determination at pp. I–11 to I–13. In addition, Chairman Watson and Commissioner Rohr joined in a dissent to the threat determination, which they explained in three pages. *Dissenting Views of Chairman Peter S. Watson and Commissioner David B. Rohr* at pp. I–3 to I–5 ("Dissenting Views"). These documents present a cogent explanation of the basis for the ITC's determination.

First, the ITC found that PRC's capacity to produce sebacic acid rose each year during the period from 1991 to 1993, the period of investigation ("POI"). Determination at p. I–12. Underutilized capacity in 1993 represented 39.4 percent of that year's United States consumption. *Id.* Given these facts, and the potential ability of the PRC to divert exports to the United States from other markets, the ITC concluded that "increasing capacity and increased unused capacity are likely to result in a significant increase in imports of merchandise to the United States." *Id.* The ITC found that the market penetration of PRC sebacic acid in the United States grew substantially during the POI to 58.9 percent of United States overall consumption, while the domestic industry's portion of domestic consumption fell substantially to 37.7 percent. *Id.* During the POI, Chinese imports to the United States comprised between 91.6 and 98.8 percent of all imports of the product into the country. *Id.* Moreover, the ITC found that the Chinese product was increasingly used for purposes that compete with the United States domestic product, and that American end users were finding the PRC product increasingly acceptable as a substitute for the domestic product. *Id.* The ITC concluded from these facts that "any increases in Chinese market share have been and are likely in the future to be at the expense of the domestic industry", *id,* and "market penetration of subject

---

**3.** "... . [T]he Commission, in each case ... *may* consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports." 19 U.S.C. § 1677(7)(B)(ii) (1988) (emphasis added).

imports is likely to increase to an injurious level." *Id.* at p. I–13.

The ITC found that the PRC product consistently sold at lower prices than the United States domestic product, even after the American domestic price was reduced in the second half of 1993 in the face of this underselling. Determination at p. I–13. The ITC noted that Chinese prices rose in the second half of 1993, remaining lower than the price for United States domestic product, after they had declined steadily during the period from 1991 to the first half of 1993. *Id.* It placed little weight on the data indicating the 1993 PRC price increase, because the increase occurred after the antidumping petition had been filed. *Id.* at fn. 94 at p. I–13. The ITC did not find "significant present adverse price effects." *Id.* at p. I–13. Nonetheless, it concluded, based on the 1993 domestic price erosion, increasing volumes of PRC product sold in the United States market and consistent underselling of the PRC product, that "it [is] likely that the subject imports will have price depressing effects on domestic prices if unabated." *Id.*

Finally, the ITC found that inventories of PRC sebacic acid held in the United States increased seven-fold from 1991 to 1993, noting a decline from a peak in 1992. Determination at p. I–13. Even excluding the inventories held by Union Camp, itself a substantial importer of sebacic acid from PRC, the amount of such inventories rose slightly less than seven-fold during that period. *Id.*

From this collection of factual findings and analyses, the ITC determined:

In light of the increasing capacity and unused capacity utilization representing the ability for the Chinese producers to produce and export to the United States large quantities of sebacic acid, the consistent and large margins of underselling by the Chinese product, the declining prices and unit values for Chinese sebacic acid, and the increased inventories of Chinese sebacic acid in the United States, we conclude that the domestic sebacic acid industry is threatened with material injury by reason of LTFV imports from China.

*Id.*

The ITC majority's decision appears to be sound as far as it goes. Dastech, however, argues that the explanation should have gone further. Specifically, Dastech asserts that the ITC majority failed to explain why it rejected evidence contrary to its findings, evidence on which the dissenting commissioners based their opinion.

The dissenting commissioners focused on several facts that the ITC majority did not discuss in its opinion. They found that the rate of increase in PRC production capacity was projected to level off in 1994 at one percent and fall to zero in 1995. Dissenting Views at p. I–4. They also credited evidence that demand for sebacic acid in the PRC home market had risen, and found that "[a]ny increase [in production capacity], however, should be absorbed to a large degree by the projected increase in Chinese home market shipments...." *Id.* The dissenting commissioners found further that the PRC industry would be working at or near full capacity in 1994 and 1995. *Id.* They concluded that "a further surge to injurious levels is not likely to occur in the near future." *Id.*

The dissenting commissioners then found that PRC exports to the United States would not gain market share here rapidly, based on the "modest" rise in the Chinese products' market share during the period studied of 8.2%. Dissenting View at pp. I–4—I–5. They noted that much of the Chinese product was imported by Union Camp, itself. *Id.*

The dissenting commissioners went on to analyze the imported goods' effect on U.S. domestic prices, crediting evidence that Union Camp priced its sebacic acid in the domestic market without regard to the prices of the Chinese product. *Id.* They found that Union Camp's prices began to decline after Chinese prices had begun to rise, and that for a period, Union Camp maintained its list prices even though the cost of its raw material, castor oil, declined. *Id.* Moreover, they found that the price of castor oil had begun to rise again, probably to exert upward pressure on the price of sebacic acid. *Id.*

The dissenting commissioners found that U.S. domestic inventories of Chinese sebacic acid would not have a injurious effect on the

United States industry. *Id.* at I–4. The basis of this finding was evidence that inventories had risen in 1991–92, but had declined in 1992–93, and that Union Camp itself held much of the inventory. *Id.* They also found no evidence of prospective injury to the domestic industry, in part because Union Camp historically had made "little or no investment to improve its sebacic acid production facilities . . . ." *Id.*

Finally, the dissenting commissioners found no other adverse trends that could indicate a likelihood of injury. Dissenting Views at p. I–5. They noted that PRC shipments to the United States had increased in absolute quantity, but as a percentage of total shipments had declined in 1992–93 by 3.2%. *Id.* They projected a decline of two-thirds in the absolute quantity of U.S. imports of PRC product in the first half of 1994 as compared to the similar period in 1993. *Id.* From the foregoing, the commissioners concluded that there was no threat of injury to the domestic industry. *Id.*

## C. DASTECH DID NOT SHOW THAT THE ITC MAJORITY FAILED TO CONSIDER EVIDENCE IN THE RECORD

Dastech contends that the ITC majority failed to consider evidence in the record, thereby failing to satisfy its mandate to consider all relevant economic factors. The primary thrust of Dastech's argument is that the majority in its opinion did not discuss evidence that is contrary to its threat of injury finding, the same evidence that caused the dissenting commissioners to find no such threat. That this showing is insufficient to vacate the ITC's determination, is established by inquiry into the obligations of the ITC to explain the reasoning on which its decisions rest.

■■■ The ITC is required to present a "reviewable, reasoned basis" for its determinations. *Bando Chem. Indus., Ltd. v. United States,* 17 CIT 798, 799 (1993) (citations omitted). Explanation is necessary, of course, for this court to perform its statutory review function. It is also "a back-up safeguard, designed to make sure, so far as it is possible to do so, that the hearing which due

process requires is a meaningful one . . . . The duty to explain presupposes that the explanation is not obvious; where it is, a statement of reasons is not required." *Hameetman v. City of Chicago,* 776 F.2d 636, 645 (7th Cir.1985) (regarding administrative law practice in general). This court previously explained:

> [t]hat this administrative agency may make varying decisions based on the facts of particular cases does not permit the agency to act arbitrarily. In order to ascertain whether action is arbitrary, or otherwise not in accordance with law, reasons for the choices made among the various potentially acceptable alternatives usually need to be explained.

*Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 1174, 1177, 704 F.Supp. 1068, 1071 (1988).

■■■ The ITC is presumed to have considered all the evidence in the record. *Roses, Inc. v. United States,* 13 C.I.T. 662, 668, 720 F.Supp. 180, 185 (1989); *Granges Metallverken,* 13 CIT at 479, 716 F.Supp. at 24; *Nat'l Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 779, 696 F.Supp. 642, 648 (1988) (citations omitted). "[T]he fact that certain information is not discussed in a Commission determination does not establish that the Commission failed to consider that information because there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties." *Granges Metallverken,* 13 CIT at 478–79, 716 F.Supp. at 24 (citations omitted). The ITC is not required to make written findings on all the factors it considers. *Negev Phosphates, Ltd. v. U.S. Dep't of Commerce,* 12 CIT 1074, 1083, 699 F.Supp. 938, 947 (1988) (citation omitted)(discussing a material injury determination). Furthermore, "the Court may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id, citing Ceramica Regiomontana v. United States,* 810 F.2d 1137, 1139 (Fed. Cir.1987); *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (applying the "arbitrary and capricious" standard).

■■■■ Dastech asserts that because of the difference between a material injury determination and a threat determination, the latter necessarily being more speculative than the former, the presumption should not apply here. Dastech did not make a convincing argument in support of this departure from settled administrative law jurisprudence. While the court recognizes the difference between threat and material injury investigations, it does not agree that separate rules must be devised for the latter. In fact, this court has applied the presumption not only the material injury determinations, but also to a threat determination. *Bando Chem. Indus., Inc. v. United States,* 17 CIT 798; *Bando Chem. Indus., Inc. v. United States,* 16 CIT 133, 787 F.Supp. 224 (1992). Moreover, the presumption that an administrative body is familiar with the record before it is generally applied in United States administrative law. *See e.g., Opie v. I.N.S.,* 66 F.3d 737, 740 (5th Cir.1995); *National Small Shipments Traffic Conference, Inc. v. Interstate Commerce Comm'n,* 725 F.2d 1442, 1455 (D.C.Cir.1984) ("presumption of procedural regularity and substantive rationality attaches to final agency action ...").

■■■■ Dastech's argument, however, is not entirely without merit. The court's function in reviewing administrative decisions is less difficult if agencies explain their decisions thoroughly and in detail. In a threat determination, where the ITC is required to consider economic factors other than those enumerated by statute, it would be helpful if all such factors, including those considered and rejected, were discussed in the commissioners' views. Nonetheless, all that is required of such decisions is that the court be able to determine the reasoning behind them, as it can here. Although it recognizes the difference between a threat determination and a material injury determination, and the greater caution that the former's speculative nature calls for, the court declines to disturb settled jurisprudence by altering the requirements the ITC must satisfy.

Having determined that the ITC is presumed to have considered the facts in the record, it remains to determine whether Dastech has overcome that presumption. As an initial matter, it is manifest that the presumption both derives from and effectuates the rule that an administrative body is not required to respond in writing to every argument or element of evidence presented by the parties before it. If mere failure to explain evidence that it rejected, even if the evidence detracts from the final determination, were fatal to an ITC decision, then the presumption would have no effect. All arguments raised would have to be discussed, and the rules set forth above would be vitiated. That position is unreasonable and untenable.

■■■ For the foregoing reasons, a party attempting to overcome the presumption must do more than assert a mere failure to discuss evidence. Having reviewed Dastech's briefs thoroughly, however, the court finds no more than a showing that the ITC did not discuss evidence in the record that arguably favors Dastech. In response to the Commission's assertion that it considered the evidence underlying Dastech's complaint and chose not to give it weight, Dastech responded

Our simple response to this argument is where in their threat of injury opinion did the Commission majority consider these material facts? Since the [ITC] General Counsel's office cannot quote one sentence in the Commission's opinion to support their premise that the Commissioners in the majority actually considered these facts, we believe that we have overcome the presumption that the Commissioners did consider these material facts and, therefore, this determination must be remanded back to the Commission for a new determination.

Plaintiffs Rely Brief at pp. 11–12. This argument says no more than the Commission failed to write about certain evidence, which is insufficient to overcome the presumption. It provides no basis to find that the ITC did not consider the record.

Dastech specified five relevant economic factors that it contends the ITC ignored. The first of these factors is that PRC domestic consumption of sebacic acid is rising and PRC exports to countries other than the United States are also rising. Dastech contends that these demands would consume the

PRC's unused production capacity, and eliminate the threat of additional exports to the United States. The effect of PRC domestic demand and non-U.S. exports relates to the statutory standard of the existence of present or prospective unused production capacity and the likelihood that use of this capacity would generate additional exports to the United States. *See* 19 U.S.C. § 1677(7)(F)(i)(II) (1988).

The ITC majority made an express finding on this subject:

We find that the presence of unused capacity for producing sebacic acid in China is significant relative to the size of the U.S. market. Given the large overall capacity for production of sebacic acid in China, as well as the potential ability to divert exports to the United States from other markets, we find that the increasing capacity and increased unused capacity are likely to result in a significant increase in the imports of merchandise to the United States.

Determination at p. I12.

Although the ITC majority did not expressly discuss the facts that Dastech cites, it is still presumed to have considered them. One can infer from the written opinion that the majority discounted those facts and gave weight to alternative facts. Rather than finding that projected increases in PRC domestic and non-U.S. export demand would prevent increases in U.S. exports, the majority found the potential for diversion of product from those uses for export to the U.S. The court cannot say that this finding is unsupported by substantial evidence in the record. Different conclusions may be drawn from the same record, and both may be supported by substantial facts. *Granges Metallverken*, 13 CIT at 475, 716 F.Supp. at 21.

Second, Dastech asserts that the majority did not consider a 2.5% decline in PRC exports to the United States between 1992 and 1993, a purported reduction in orders by U.S. importers of PRC product, and Union Camp's decision to stop importing product from China. This evidence relates to the third factor set forth in the statute, whether a significant rate of increase in the volume or market penetration of imports indicates the likelihood of increased imports into the U.S.

19 U.S.C. § 1677(7)(F)(i)(III) (1988). There is no evidence that the ITC did not consider these facts, and there is considerable contrary evidence on which it based its conclusions.

Chinese shipments to the U.S. market increased in absolute volume during the period studied; they increased as a percentage of total shipments, although they fell slightly in 1992–93. Dissenting Views at p. 1–5. The reduction in market orders for 1994 was based on a projection, which the majority was not constrained to accept. *See id; see also* Staff Report at pp. I–38–39. In fact, the projection was based on answers to a questionnaire that reflected the orders that three importers had placed, and was hedged by the ITC staff as follows: "*If* the expectations of these three companies are accurate and *if* no other companies import sebacic acid from China, the level of such imports for January–June 1994 would decline by over two-thirds from the level reported for January–June 1993 in the preliminary investigation." Staff Report, fn 67 at p. 1–38 (emphasis added).

It is neither surprising nor impermissible that the majority declined to give weight to this evidence. Finally, the ITC majority itself noted that "[t]he share of sebacic acid from China imported and internally consumed by Union Camp decreased significantly from 1991 to 1993." Determination at p. I–12.

The foregoing does not suggest that the ITC's findings relative to the contested matters was not supported by evidence on the record. To the contrary, the majority found that the market penetration of PRC imports into the United States, reflected by the percentage of U.S. consumption imported from China, rose by more than twenty percent from 1992 to 1993 to a level in excess of 58%. Determination at p. I–12. Dastech has not established a reason here to remand the ITC's decision.

Dastech's third contention is that the ITC majority did not consider Union Camp's pricing policies in rendering its threat determination. This evidence relates directly to the fourth statutory element of the threat inves-

tigation, *i.e.*, whether imports are entering at prices that are likely to suppress U.S. domestic prices and increase demand for imports. 19 U.S.C. § 1677(7)(F)(i)(IV) (1988). The majority made express findings concerning Union Camp's pricing that reflects adequate consideration:

> Specifically, in the two largest markets for sebacic acid … the U.S producer cut its prices during the latter half of 1993 in the face of underselling of the Chinese product. For sales to the plasticizer market, Union Camp's price reduction followed three quarters during which the Chinese product undersold the U.S. product by more than 50 percent and occurred during the year in which the unit values of the Chinese imports were at their three-year low.... Although we did not find significant present adverse price effects, the late-in-the-period domestic price erosion suggests a likelihood of price depression if the increase in the volumes of low-priced Chinese sebacic acid sold in the open market continues....

Determination at p. I–13. Dastech argues that Union Camp's price reduction for its sebacic acid reflected a change in its marketing strategy, rather than downward pressure from import competition. That may be arguably true, but the fact that the ITC majority weighed the evidence and interpreted causation differently is not a basis for remand. This court simply may not reweigh the evidence. *E.g., Trent Tube Div.*, 975 F.2d at 814.

Dastech also contends that the ITC ignored the timing of Union Camp's price reduction, which occurred post-petition and after the Commission reached its preliminary determination. Post-petition pricing changes may be suspect because of the possibility of posturing to promote the outcome a party desires. Indeed, the majority noted in a footnote that it placed little weight on evidence that the price of PRC product rose in

the second half of 1993 because "this data … reflects pricing practices instituted after the filing of the petition in this investigation.." Determination fn 94 at p. I–13. The Commission was well aware of the effect of timing on evidence of pricing changes.

Moreover, the majority recognized the timing of Union Camp's price reduction, calling it "late-in-the-period domestic price erosion" and stating that it "did not occur until the second half of 1993." Determination at p. I–13. Although consistency in the treatment of evidence may be preferable, Dastech's argument goes to the weight accorded evidence of pricing changes by PRC exporters and Union Camp. The court cannot disturb the ITC's determination on this basis.

Finally, Dastech asserts that the ITC majority did not consider the effect of Union Camp's price reduction on the company's financial well-being. Union Camp admitted at an ITC hearing that its price reduction caused it to regain some market share and improve its financial performance. Plaintiff's Brief at pp. 41–42 citing Test. of Peter Deutch, USITC Admin. Rec. List 1, Doc # 50, Hearing Transcript at 61–62. That is not a remarkable event, nor is it necessarily evidence adverse to the affirmative threat determination. The ITC majority found that Union Camp's "operating income margin dropped from 1991 to 1992, but then rose in 1993, although remaining below the 1991 level." Determination at p. I–9 [4]. In light of its finding that a prospective increase in imports from China and their market penetration is likely, this finding does not significantly undermine the Commission's affirmative threat determination.

From the foregoing, the court concludes that Dastech has not established that the ITC failed to consider relevant economic factors in its affirmative threat determination, and that Dastech has not established that the ITC's affirmative threat determination is not

---

**4.** Dastech also complained that the majority did not address whether the domestic industry was vulnerable. The majority—including Commissioner Watson, who dissented to the threat determination—prepared a detailed analysis of the condition of the domestic industry. Determination p. I–7. Although it was included in the

section of the Determination that referred to the negative material injury determination, there is no reason to assume that it did not reach the threat determination. There is no express statutory requirement that the Commission make a separate vulnerability determination as part of its threat analysis.

supported by substantial evidence in the record or otherwise not in accordance with law.

## IV. CONCLUSION

For the foregoing reasons, the court finds that the ITC's determination of threat of injury is supported by substantial evidence and in accordance with law, and that it did not fail to consider material evidence or relevant economic factors. Dastech's motion for judgment on the agency record is denied.

## JUDGMENT

This case having come before the Court for Decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

**ORDERED, ADJUDGED and DECREED** that Plaintiffs' Motion for Judgment on the Agency Record is denied; and it is further

**ORDERED, ADJUDGED and DECREED** that the action of the International Trade Commission is sustained.

