**Slip Op. 02-70**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| **USINOR, BEAUTOR, HAIRONVILLE, SOLLAC** | : | |
| **ATLANTIQUE, SOLLAC LORRAINE, and** | : | |
| **USINOR STEEL CORPORATION, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | **Before:   Wallach, Judge** |
| v. | : | **Consol. Court No.: 01-00010** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant,** | : | |
| | : | |
| **and** | : | **PUBLIC VERSION** |
| | : | |
| **BETHLEHEM STEEL CORPORATION,** | : | |
| **ISPAT INLAND, INC., LTV STEEL** | : | |
| **COMPANY, INC., NATIONAL STEEL** | : | |
| **CORPORATION, and U.S. STEEL GROUP, a** | : | |
| **unit of USX CORPORATION,** | : | |
| | : | |
| **Defendant-Intervenors.** | : | |

[Review Determination (affirmed in part, remanded in part).]     Decided: July 19, 2002

Weil, Gotshal & Manges LLP, (A. Paul Victor, Gregory Husisian, Amy Dixon,) New York, for Plaintiffs Usinor, Beautor, Haironville, Sollac Atlantique, Sollac Lorraine, and Usinor Steel Corporation.

Sharretts, Paley, Carter & Blauvelt, P.C. (Gail T. Cumins, Ned Marshak) New York, for Plaintiffs Thyssen Krupp Stahl AG, Stahlwerke Bremen GmbH, EKO Stahl GmbH, and Salzgitter AG.

Gracemary Rizzo, Office of the General Counsel, Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, U.S. International Trade Commission, Washington D.C., for Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Stephen Vaughn, John J. Mangan, Robert E. Lighthizer) Washington D.C., for Defendant-Intervenors Bethlehem Steel Corporation, LTV Steel

Company, Inc., National Steel Corporation, and U.S. Steel Group, a unit of USX Corporation.

Dewey Ballantine LLP (Kevin M. Dempsey, Rory F. Quirk, Michael H.Stein, Alan Wm. Wolff) Washington D.C., for Defendant-Intervenors Bethlehem Steel Corporation, Ispat Island Inc., LTV Steel Company, Inc., and U.S. Steel Group, a unit of USX Corporation.

# I

# INTRODUCTION

Plaintiffs Usinor, Beautor, Haironville, Sollac Atlantique, Sollac Lorraine, and U.S. importer Usinor Steel Corporation (collectively "French Producers"), and plaintiffs Thyssen Krupp Stahl AG, EKO Stahl GmbH, Stahwerke Bremen GmbH, and Salzgitter (collectively "German Producers") move for judgment upon the agency record pursuant to USCIT Rule 56.2, challenging the United States International Trade Commission's ("Commission" or "ITC") final determination in the five-year administrative review ("Sunset Review") of antidumping and countervailing duty orders on corrosion resistant carbon steel products ("CRCS") from France and Germany, conducted under 19 U.S.C. § 1675(c) (1999). Plaintiffs contest the Commission's determination that revocation of the countervailing duty orders and antidumping duty orders on certain carbon steel products from specified countries, including corrosion-resistant carbon steel from France and Germany, would likely lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 65 Fed. Reg. 75,301 (Dec. 1, 2000) ("Notice of Commission's Determination").

2

# BACKGROUND

In August 1993, the Commission determined that the domestic CRCS industry was materially injured or threatened by material injury by reason of less than fair value ("LTFV") and subsidized imports of CRCS from, among other countries, France and Germany. See Certain Flat-Rolled Carbon Steel Products from Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden, and the United Kingdom, USITC Pub. 2664, Inv. Nos. 701-TA-319-332, 334, 336-342, 344 and 347-353 and 731-TA-573-579, 581-592, 594-597, 599-609, and 612-619 (Final) (Aug. 1993) ("Original Determination"). Accordingly, the Department of Commerce published antidumping and countervailing duty orders covering the subject merchandise from these countries. See Countervailing Duty Order and Amendment to Final Affirmative Countervailing Duty Determination: Certain Steel Products From France, Part VI, 58 Fed. Reg. 43,759 (Aug. 17, 1993); Countervailing Duty Orders and Amendment to Final Affirmative Countervailing Duty Determinations: Certain Steel Products From Germany, Part VI, 58 Fed. Reg. 43,756 (Aug. 17, 1993); Antidumping Duty Order and Amendments to Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon Steel Flat Products, Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate from France, 58 Fed. Reg. 44,169 (Aug. 19, 1993); Antidumping Duty Orders and Amendments to Final Determinations of Sales at Less Than Fair Value: Certain Hot-Rolled Carbon Steel Flat Products, Certain Cold-Rolled Carbon

Steel Flat Products, Certain Corrosion-resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Germany, 58 Fed. Reg. 44,170 (Aug. 19, 1993).

On September 1, 1999, the Commission concurrently instituted sunset reviews[1] concerning the countervailing duty and antidumping orders on certain carbon steel products from France and Germany with sunset reviews regarding CRCS from Australia, Canada, Japan, and Korea.[2] See Carbon Steel Products from Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, 64 Fed. Reg. 47,862 (Sept. 1, 1999). On December 3, 1999, the Commission decided to conduct full reviews.[3] See Certain Carbon Steel Products From Australia, Belgium,

---

[1] Under 19 U.S.C. § 1675a, the Commission conducts a sunset review, following a previous countervailing duty or antidumping order based on a finding of material injury to the domestic industry, to determine if the material injury is likely to continue or recur if the orders are revoked. In making this likelihood determination, the agency must consider "the likely volume, price effect, and impact of the imports of the subject merchandise on the industry if the order is revoked," taking into account, among other things, its prior injury determination. Thus, the causation inquiry in sunset reviews is inherently predictive and necessarily relies on past findings to predict future trends. In addition, if it complies with the requirements of 19 U.S.C. § 1675a, the Commission has the discretion to cumulate the various imports under review.

[2] The Commission's review also encompassed other carbon steel products, namely, cut-to-length steel plate and cold-rolled carbon steel flat products.

[3] Sunset reviews may take one of two forms, a "full sunset review" or an "expedited sunset review." In particular, the agency's obligation to conduct fact-gathering beyond the facts available is what distinguishes a full sunset review from the expedited version. The Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316 at 879-80 (1994), distinguishes between a "full [sunset] review" involving "fact gathering," and an "expedited review" based on "facts available" as follows:

> The facts available may include prior agency determinations involving the subject merchandise as well as information submitted on the record by parties in response to the notice of initiation. . . . [T]he agencies may decide separately whether the responses are inadequate and whether to issue a determination based on the facts available without further fact-gathering. [Section 1675(c)(3)] is intended to eliminate needless reviews. . . . If parties provide no or inadequate information in

4

<u>Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom</u>, 64 Fed. Reg. 71,494 (Dec. 21, 1999).

Pursuant to 19 U.S.C. § 1675a(a)(7), the Commission "cumulated" likely volume and price effects from all countries under review. <u>See</u> Notice of Commission's Determination. The Commission summarizes its cumulation reasoning as follows:

> The Commission . . . determined the subject imports from each of the individual countries would not be likely to have no discernable impact if the orders were revoked . . . In determining whether it should cumulate subject imports, the Commission next found that, although price and volume trends of the subject imports of the six countries varied, none were sufficiently distinct from the others as to preclude any country's subject imports from cumulation.

Defendant United States International Trade Commission's Opposition to Plaintiffs' Motion for Summary Judgment on the Agency Record ("Defendant's Opposition") at 6 (footnotes omitted).

Following cumulation, the Commission next determined that revoking the subject orders would severely impact the domestic CRCS industry. The Commission stressed its findings that the domestic industry would be faced with significant volume and price declines for its product given its determination that the nations under review had high levels of excess capacity coupled with cost margins that necessitate maximum employment of capacity:

> The Commission found that revocation of the orders would likely lead to significant volume and price declines for the domestic corrosion-resistant steel industry. The commission found that there was considerable production capacity, as well as excess capacity to produce corrosion-resistant steel in the countries exporting the subject merchandise, which was particularly relevant in light of the

---

> response to a notice of initiation, it is reasonable to conclude that they would not provide adequate information if the agencies conducted a full-fledged review. However, when there is sufficient willingness to participate and adequate indication that parties will submit information requested throughout the proceeding, the agencies will conduct a full review.

Statement of Administrative Action at 879-80.

need of subject producers to maximize capacity utilization in order to remain profitable.

Defendant's Opposition at 3.

Ultimately, the Commission voted on November 2, 2000 in support of a determination that on a cumulated basis, the antidumping and countervailing duty orders with respect to those countries should remain in place. See Certain Carbon Steel Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Netherlands, Poland, Romania, Spain, Sweden, Taiwan, and United Kingdom, Inv. Nos. AA1921-197 (Review), 701-TA-231, 319-320, 332, 325-328, 340, 342, and 348-350 (Review), and 731-TA-573-576, 578, 582-587, 604, 607-608, 612, and 614-618 (Review) (Nov. 27, 2000) ("Review Determination").

Plaintiffs' action contests the Commission's determination not to revoke the antidumping and countervailing duty orders on CRCS from France and Germany.

## III
## STANDARD OF REVIEW

The court will uphold the Commission's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B) (1994). Substantial evidence is "more than a mere scintilla" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938); Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). In applying this standard, we affirm the agency's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's

6

conclusions. Olympia Indus., Inc. v. United States, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998) (citing Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1563 (Fed. Cir. 1984)). The court may not reweigh the evidence or substitute its own judgment for that of the agency. See Granges Metallverken AB v. United States, 13 C.I.T. 471, 474, 716 F. Supp. 17, 21 (1989) (citations omitted). Additionally, "absent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record." See Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988) (citations omitted).

The possibility of drawing two inconsistent conclusions from the same evidence does not mean that the agency's finding is unsupported by substantial evidence. See Chefline Corp. v. United States, 170 F. Supp. 2d 1320, 1325 (CIT 2001). In other words, the Commission's determination will not be overturned merely because the plaintiff "is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination." Id. (citing Torrington Co. v. United States, 14 CIT 507, 514, 745 F. Supp. 718, 723 (1990) (internal quotation omitted), *aff'd*, 938 F.2d 1276 (Fed. Cir. 1991).

In reviewing an agency's construction of a statute that it administers, this court addresses two questions outlined by the Supreme Court in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." Id. at 842. If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency's interpretation "is based on a permissible construction of the statute." Id. "To survive judicial scrutiny, an agency's construction need not be the only

reasonable interpretation or even the most reasonable interpretation." <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994). Thus, when faced with more than one reasonable statutory interpretation, "a court must defer to an agency's reasonable interpretation . . . even if the court might have preferred another." <u>NSK Ltd. v. United States</u>, 115 F.3d 965, 973 (Fed. Cir. 1997) (citations omitted); <u>U.S. Steel Group v. United States</u>, 225 F.3d 1284, 1285-86 (Fed. Cir. 2000); <u>cf.</u> <u>United States v. Mead Corp.</u>, 533 U.S. 218, 121 S. Ct. 2164, 150 L.Ed. 292 (2001).

**IV**

**ANALYSIS**

**A**

**Since the Commission's Decision to Cumulate the French and German Producers' Imports Is Not Supported by Substantial Evidence A Remand is Necessary**

The Commission's entire analysis of the imports from the six cumulated countries is relatively brief and states that the reviewed imports maintained a market presence even while burdened under the subject orders, and concludes that revocation would adversely impact a weakened domestic industry. As the French Producers point out, nearly the entire discussion of the Plaintiffs' imports and their particular characteristics are contained in the following three paragraphs:

> Subject imports from Australia, Canada, France, Germany, Japan, and Italy have remained in the U.S. market in the years since the orders were imposed. The continuing presence of these subject imports in the domestic market indicates that subject foreign producers continue to have the contacts and channels of distribution necessary to compete in the U.S. market.
> The corrosion-resistant steel industries in the subject countries devote considerable resources to export markets. While capacity utilization rates have topped [ ] percent in each of the subject countries during the period of review,

there appears to be available excess capacity in each country.

> We are mindful that the volume of the subject imports has decreased from the time the orders were imposed. Yet in the context of this particular industry, including its weakened condition, we find that a likelihood exists that even a small post-revocation increase would have a discernable impact on the domestic industry.

Review Determination at 71-72 (footnotes omitted).

The Plaintiffs challenge the Commission's cumulation decision. The French Producers assert that "[b]y grouping all countries together for purposes of its analysis, the Commission failed to explore important differences in the willingness and/or ability of the French Producers to participate in the U.S. market, and thus failed to provide individual analysis of the imports from each country required by the statute and the SAA." Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment Upon the Agency Record" ("French Motion") at 3. Largely mirroring the French Producers, the German Producers assert that "[t]hroughout the CRCS Sunset Review proceeding, German Producers reasonably believed that they would satisfy the 'no discernable impact' test . . . " Brief of Plaintiffs Thyssen Krupp Stahl AG, Stahlwerke Bremen GMBH, Eko Stahl GMBH, and Salzgitter AG In Support of Motion Under Rule 56.2 For Judgment Upon the Agency Record ("German Motion") at 2.

The Plaintiffs argue that, based on the record evidence, the Commission was required to undertake a country specific analysis with regard to their imports and that cumulation prevented the Commission from reaching an accurate determination. Specifically, the French Producers complain that "the Commission ignored uncontroverted record evidence demonstrating that the French Producers are unable to increase exports to the U.S. market due to capacity constraints and existing commitments to customers within the EU, and, consequently, that the French CRCS imports could not have a discernable impact on the domestic industry." French Motion at 3. They

9

also claim the Commission's cumulation of French imports was based on an unsupported

conclusion that "all imports would compete under similar conditions of competition and there

would be a reasonable overlap in competition." Id. According to the French Producers, this

conclusion was "reached without consideration of any of the record evidence which showed that

French imports would not compete under the same conditions of competition as other subject

imports and the domestic like product." Id. (emphasis in original).

The German Producers echo these complaints. They assert that the following factors

should have led the Commission to conclude that no discernable impact would be likely if the

subject orders were lifted, thereby barring cumulation:

> (1) the decline in German CRCS imports after the AD/CVD Orders were issued in 1993 resulted from market factors (i.e., the switch in customer demand from CRCS to microalloy products), rather than from the impact of the Orders; (2) German CRCS imports into the United States were negligible from 1997 – March 2000 (.022 percent of domestic CRCS and 2.2 percent of total CRCS imports into the United States); (3) German CRCS mills were operating at full capacity in 2000; (4) German CRCS mills would continue to operate at full capacity in the foreseeable future; and (5) there was no likelihood that German imports into the United States would increase to non-negligible levels.

German Motion at 2-3. Like the French Producers, the German Producers claim the

Commission's conclusion regarding available excess capacity in Germany was unsupported by

substantial evidence. In short, the German Producers aver that "when the Commission issued its

Sunset Review determination, negligible quantities of German CRCS were being imported into

the United States . . . and German mills were operating at full capacity." Id. at 13. (internal

citations omitted).

Due to the Commission's total failure to analyze or rebut evidence submitted by the

Plaintiffs, the court concludes that its decision to cumulate is not supported by substantial

10

evidence.  General analysis of all producers under review without any discussion of evidence that weighs against cumulation cannot satisfy the cumulation standard.

**1**

**The "No Discernable Impact" Standard Does Not Necessarily Conflict with International Obligations**

The statute, without imposing specific numerical boundaries, precludes cumulation of a country's imports if the Commission finds that such imports are likely to have "no discernible adverse impact on the domestic industry."  The statute, however, provides no analysis upon which the Commission should rely in determining whether there is "no discernible adverse impact." 19 U.S.C. § 1675a(a)(7) (1995) provides:

> (7) Cumulation. For purposes of this subsection, the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 751(b) or (c) [19 USCS § 1675(b) or (c)] were initiated on the same day, if such <u>imports would be likely to compete with each other and with domestic like products </u>in the United States market. <u>The Commission shall not cumulatively assess the volume and effects of imports </u>of the subject merchandise in a case in which it determines that such imports are <u>likely to have no discernible adverse impact on the domestic industry</u>.

<u>Id.</u> (emphasis added).  The Commission and the German Producers present the court with competing standards for cumulation under this provision, one based solely on import volume and one based on import impact.

The Uruguay Round Agreements Act's ("URAA"), Pub. L. No. 103-465, § 220(a), 108 Stat. 4809, 4858 (1994), legislative history provides little guidance as to the application of the "no discernable impact" standard. Tracking the language of the statute, it provides that "it is

11

appropriate to preclude cumulation {in five-year reviews} where imports are likely to be negligible." S. Rep. No. 103-412, p. 51 (1994).

Against this backdrop, the German Producers contend that the Commission has violated its international obligations. In particular, they claim that the "express language of [Article VI of the General Agreement on Tariffs and Trade 1994] [hereinafter, "Antidumping Agreement"] requires the Commission to consider whether imports from Germany would be negligible upon revocation." German Motion at 9. The German Producers cite Articles 11.3, 3.3, and 5.8 of the Antidumping Agreement. Article 3.3 states that cumulation shall occur only where "the volume of subject imports is not negligible . . ." and Article 5.8 provides that "the volume of dumped imports shall normally be regarded as negligible if the volume of the dumped imports from a particular country is found to account for less than 3 percent of imports of the like product in the importing Member, unless countries which individually account for less than 3 percent of the imports of the like product in the importing Member collectively account for more than 7 percent of imports of the like product in the importing Member."

Hence, the German Producers argue that "[s]ince the Commission did not consider whether German imports would exceed 3 percent of total imports upon revocation, or whether imports from all subject countries which were individually less than 3 percent would cumulatively be less than 7 percent if the Orders were revoked, the Commission's determination was contrary to U.S. international obligations." German Motion at 10.

The Commission contends that its analysis of the French and German Producers' evidence is consistent with the proper reading of 19 U.S.C. § 1675a(a)(7). The Commission claims that the "no discernable impact" provision is not tantamount to a "negligibility assessment." Defendant's

12

Opposition at 15. It argues that "[a]s the plain language of the provision indicates the required determination is whether there is likely to be a discernable *impact*, not whether the likely volume appears significant in the abstract." Id. at 14 (emphasis in original). In other words, the Commission argues that the standard is not driven solely by volume, such that an inherently negligible level of imports may yield a discernable impact when viewed in context of the domestic industry. Indeed, the Commission faults the Plaintiffs for mischaracterizing the proper analysis under the statute as one that turns on volume, stating that the "Usinor plaintiffs ignore that the Commission's responsibility is to determine whether revocation would likely lead to a discernable adverse impact." Defendant's Opposition at 20.

Moreover, the Commission attacks the German Producers' contention that the Commission was obligated to abide by any predefined numerical parameters. The Commission cites the Senate Report accompanying the cumulation provision, which provides:

> . . . The Committee believes that it is appropriate to preclude cumulation where imports are likely to be negligible. However, the Committee does not believe that it is appropriate to adopt a strict numerical test for determining negligibility because of the extraordinary difficulty in projecting import volumes into the future without precision. Accordingly, the Committee believes that the "no discernable impact standard" is appropriate in sunset reviews.

S. Rep. No. 103-412, p. 51 (1994). In addition, the Commission cites Neenah Foundry Co. v. United States, 155 F. Supp. 2d 766 (CIT 2001), wherein the court states:

> if [Congress] had intended that the ITC consider only import volume in deciding whether cumulation was precluded, it would have restricted its enactment. It did not. Congress chose "no discernable adverse impact," and *impact* in the context of U.S. unfair trade law, by any definition, encompasses more than volume of imports."

Id. at 776 (emphasis in original). As a result, the Commission claims that since the Commission's

13

actions are consistent with U.S. law, the WTO Antidumping Agreement is inapplicable. See Defendant's Opposition at 15-16. The Defendant also cites Campbell Soup Co. Inc. v. United States, 107 F.3d 1556, 1564 (Fed. Cir. 1997) and Fujitsu Gen. Am., Inc. v. United States, 110 F. Supp. 2d 1061, 1083 (CIT 2000), *aff'd*, 283 F.3d 1364 (Fed. Cir. 2002)) for the general proposition that where the statute is unambiguous it will prevail over a conflicting international obligation.

The court in Fujitsu, based upon its conclusion that 19 U.S.C. § 1677g(b) was unambiguous, upheld the Commission's reading of the statute, despite the Petitioner's claim that this reading failed to comply with the Antidumping Agreement. The court, taking note of 19 U.S.C. § 3512(a)(1), which provides that "[n]o provision of any of the Uruguay Round Agreements, nor the application of any such provision to any person or circumstance, that is inconsistent with any law of the United States shall have effect," declined to override the Commission:

> Even assuming the instruction of 19 U.S.C. § 1677g(b) were somehow inconsistent with the WTO Antidumping Agreement, however, an unambiguous statute will prevail over an obligation under the international agreement. . . . As 19 U.S.C. § 1677g(b) unambiguously provides that interest on antidumping duty payments must be compounded in accordance with 26 U.S.C. § 6621, even if we were so inclined, this Court cannot alter or repeal the clear instruction of the statute.

Fujitsu at 1083 (citing Fed. Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995)).

However, this court has also repeatedly held that the Commission is to administer the antidumping laws in a manner consistent with international obligations. See Hyundai Elecs. Co., Ltd. v. United States, 23 CIT 302, 53 F. Supp. 2d 1334 (1999); McCulloch v. Sociedad Nacional, 372 U.S. 10, 21-22, 83 S.Ct. 671, 9 L. Ed. 2d 547 (1963); Caterpillar, Inc. v. United States, 941 F.

14

Supp. 1241, 1247-48 (CIT 1996). Notably, in Hyundai, the court states, "[T]he Statement of Administrative Action to the URAA, H.R. Doc. No. 103-316 (1994), at 669, provides that the URAA was 'intended to bring U.S. law fully into compliance with U.S. obligations under [the Uruguay Round] agreements.' Accordingly, the Antidumping Agreement is properly construed as an international obligation of the United States." The court goes on to state that "[w]hen confronted with a conflict between an international obligation and U.S. law, . . . absent express language to the contrary, a statute should not be interpreted to conflict with international obligations." Hyundai, 53 F. Supp. 2d at 1334. This canon of statutory construction emerged from the decision in Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 2 L. Ed. 208 (1804), in which the Supreme Court stated:

> It has also been observed that an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains, and consequently can never be construed to violate neutral rights, or to affect neutral commerce, further than is warranted by the law of nations as understood in this country.
>
> These principles are believed to be correct, and they ought to be kept in view in construing the act now under consideration.

Id. at 118; see also Federal Mogul, 63 F.3d at 1581; Footwear Distribs., 18 C.I.T. at 408, 852 F. Supp. at 1091. Moreover, although Chevron states that a reasonable interpretation of an ambiguous statute by an agency should ordinarily be afforded deference, where international obligations arise, the reasonability of the agency's interpretation must be gauged against such obligations. See Hyundai, 53 F. Supp. 2d at 1334 ("Chevron must be applied in concert with the Charming Betsy doctrine when the latter doctrine is implicated."); DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council, 485 U.S. 568, 574-75, 99 L. Ed. 2d 645, 108 S. Ct. 1392 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious

15

constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress . . . This cardinal principle has its roots in Chief Justice Marshall's opinion for the Court in Murray v. The Charming Betsy, 2 Cranch 64, 118 (1804)")(citations omitted); See also Jane A. Restani & Ira Bloom, *Interpreting International Trade Statutes: Is the Charming Betsy Sinking*?, 24 Fordham Int'l L.J. 1533 (2001).

Indeed, the Hyundai court conducted its own analysis to determine whether the Department of Commerce regulation at issue conflicted with the Antidumping Agreement. The Hyundai court ultimately concluded that the regulation, (despite a WTO ruling to the contrary), was in accord with the Antidumping Agreement. The court notes that no such analysis regarding the cumulation provision's relationship with the Antidumping Agreement is present in the Review Determination and that the Defendant merely dismisses it within its Opposition Brief.

Although the Senate Report and the language of the statute appear to conflict with the Antidumping Agreement, it is still unclear whether they in fact may be read in harmony. The URAA simply states that cumulation shall not occur where the subject imports are "negligible," while in the above Senate Report the Senate Committee states that it "does not believe that it is appropriate to adopt a *strict* numerical test for determining negligibility . . . ." S. Rep. No. 103-412, p. 51 (1994) (emphasis added). Indeed, the test for negligibility under article 5.8 of the Antidumping Agreement is preceded with the language "shall normally." AD Agreement, Article 5.8. The fact that imports under review "shall normally" be deemed negligible as per the numerical test may imply that the test is not absolutely binding at all. In other words, the "shall normally" language may afford the importing country some flexibility to decline to apply the

16

numerical test under certain circumstances.[4] Under this reading of the "shall normally," it is possible that the Antidumping Agreement's test does not violate the Senate Report's prohibition.

In fact, the Statement of Administrative Action to accompany the Uruguay Round Agreements, ("SAA"), H.R. Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4212 (1994), summarizes the various articles within the Antidumping Agreement and discusses the degree to which Unites States' law conforms with or differs from the Agreement, including how the United States intends to implement WTO's "normally" language with regard to home market sales. It provides:

> The Administration has adopted the standard in the Antidumping Agreement that sales in the home market "normally" will be considered of sufficient quantity to render the home market viable if they are five percent or more of sales to the United States. **The Administration intends that Commerce will normally use the five percent threshold except where some unusual situation renders its application inappropriate**.

SAA at 821 (emphasis added). It is possible that this interpretation of "normally" to mean "generally," may serve as a model for applying the Antidumping Agreement's test for negligibility. However, other than the SAA's handling of the "normally" language in the home market sales context, the court is unaware of any authority that indicates the "shall normally" language is permissive, nor did the parties provide any such authority. In fact, the reverse may also be true, such that the Antidumping Agreement's numerical test for negligibility is absolute. In this event, the Commission's position would directly oppose the Antidumping Agreement.[5]

---

[4] Counsel for the German Producers conceded during oral argument that Article 5.8's numerical test is not mandatory in every case due to the term "normally," but argued that the Commission must have a very compelling reason for declining to apply the test.

[5] In addition, the SAA acknowledges Article 5.8's numerical test, and that the Commission has yet to incorporate its own numerical test, and it calls for changes in U.S. law. With regard to

17

On remand, the Commission must address these possibilities as part of its overall duty to administer the antidumping laws in accordance with its international obligations. The Commission may ultimately conclude that departing from the Antidumping Agreement's numerical test is consistent with the Antidumping Agreement based upon the "shall normally" language. In this event, the Commission must discuss and explain how and why the numerical test is not applicable in this instance. In the alternative, the Commission must further discuss how and why its position is irreconcilable with the Antidumping Agreement and the impact of the SAA on the proper interpretation of the statute. The Commission may not simply disregard the Antidumping Agreement by loosely invoking court decisions that stress the primacy of domestic law where a conflict with international law arises. Rather, it must first expressly identify and analyze such a conflict before relying on those decisions.

article 5.8, the SAA reiterates the language of the negligibility test and states that the "U.S. International Trade Commission . . . currently does not have any specified numerical thresholds for negligible imports." SAA at 812. In addition, the SAA prefaces its entire breakdown of the Antidumping Agreement with the observation that the Antidumping Agreement "does require a number of changes in U.S. law, such as new standards for determining whether . . . import volumes are negligible . . . ." SAA at 807. Given the SAA's discussion of Article 5.8 and the apparent need to change U.S. law, one could argue that 19 U.S.C. § 1675a(a)(7)'s "no discernable impact standard" may differ from the Antidumping Agreement precisely because it lacks any numerical parameters, as a result supporting the Commission's interpretation. In that event, U.S. law may simply be in conflict with the Antidumping Agreement and it is the legislature's duty to resolve such a conflict. However, the court notes that 19 U.S.C. § 1675a became effective on January 1, 1995, following the SAA, and pursuant to § 291 of the URAA as well as Presidential Proclamation No. 6780, To Implement Certain Provisions of Trade Agreements Resulting From the Uruguay Round of Multilateral Trade Negotiations, and for Other Purposes, 60 Fed. Reg. 15,845 (1995). As such, it is possible that the "no discernable impact" standard was actually drafted with an eye towards implementing the Antidumping Agreement, thereby rendering the Commission's position potentially untenable. See Jane A. Restani & Ira Bloom, Interpreting International Trade Statutes: Is the Charming Betsy Sinking?, 24 Fordham Int'l L.J. 1533, 1543 (2001) (Judge Restani and Professor Bloom argue that where a statute implementing an international agreement is ambiguous and the international agreement is clear, the latter may be viewed as secondary legislative history).

**2**

**The Commission's No Discernable Impact Finding, In Light of Record Evidence
Concerning the Plaintiffs' Capacity Utilization, Is Not Supported by Substantial Evidence**

Even if the Commission is not bound by a precise numerical rule, the Commission must still base its conclusion on the record evidence before it. Here, the Commission failed to analyze country data specific to both the French and German Producers, which materially undermines the assertion that their imports would have a discernable impact on the domestic industry. Despite claiming to perform a country-by-country assessment prior to cumulation, the Commission failed to sufficiently explain why the submitted evidence detailing capacity utilization within France and Germany does not undermine the Commission's conclusion that the subject imports would not be likely to have no discernable impact if the subject orders were lifted. As a result, its decision to cumulate is not supported by substantial evidence.

The heart of the Commission's cumulation decision is its finding that "there was still excess production capacity in each of the six countries despite the fact that high capacity utilization rates had been reported for each." Defendant's Opposition at 16. It substantiates its position by stressing that the proper time frame in which to assess the Plaintiffs' capacity utilization rates is 1997 to *March* 2000. It further claims that the Plaintiffs' attempts to present evidence outside that time frame are unwarranted and impermissibly request the Commission to "reweigh the evidence."

The Defendant-Intervenors defend the Commission's refusal to consider capacity utilization evidence for the year 2000's remaining quarters, citing <u>Kenda Rubber Indus. Co., Ltd. v. United States</u>, 10 CIT 120, 126 630 F. Supp. 354, 359 (1986) for the proposition that "the

19

Commission has discretion to examine a period that most reasonably allows it to determine whether a domestic industry is injured by [Less Than Fair Value] imports." Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record Filed by Defendant-Intervenors Bethlehem Steel Corporation, LTV Steel Company, Inc., National Steel Corporation, and United States Steel LLC ("Defendant-Intervenors Opposition") at 37. Accordingly, the Commission asserts that it "was quite reasonable for the Commission to rely on full-year figures to be more probative for predicting future utilization rates than the partial 2000 figures presented by German subject producers." Defendant's Opposition at 22.

Nonetheless, in making a present material injury determination, the Commission must address record evidence of significant circumstances and events that occur between the petition date and the vote day. The antidumping and countervailing duty laws are intended to balance the future competitive environment between the domestic industry and various foreign importers. See Imbert Imp., Inc. v. United States, 331 F. Supp. 1400, 1406 n.10 (1971) (citations omitted), *aff'd*, 60 CCPA 123, 475 F.2d 1189 (1973). Administrative integrity requires that the Commission not employ its discretion to blind itself to evidence that may materially impact its imposition of remedial duties. The Commission fails to demonstrate or explain why analyzing full year figures as opposed to the contested partial figures for 2000 would be more probative of future imports. If the Commission is really engaged in a predictive analysis, purposefully excluding evidence of capacity levels closest in time to the possible revocation of the orders is improper. A discernable impact determination in this case can only be made if the materially relevant evidence properly in the record is addressed.

The court is guided by the present injury determination rationale articulated in Chr.

20

Bjelland Seafoods A/S v. United States, 19 CIT 35 (1992). In that case, the court held that the Commission in making a present injury determination must consult evidence within a time frame as close as possible to the vote day. The court stressed that agency discretion while valid, must not override this basic principle and that older information on the record provides a historical backdrop against which to analyze fresher data:

> Although the entirety of the administrative record must be evaluated, a finding of "present" injury must reference a time period which is as nearly contemporaneous to vote day as possible and for which reliable record evidence is available. This is not to say that the ITC may not exercise its discretion in choosing the most appropriate time frame for its investigation. Nor does the court mean to preclude the ITC from addressing the possibility that negative effects of a present material injury are latent. The court merely observes that, within the time frame established by the ITC for its investigation, relatively older information serves to provide a historical frame of reference against which a "present" (i.e., as recent to vote day as possible, given the limitations of the collected data) material injury determination is to be made, and without which any assessment of the extent of changed circumstances would be impossible. Indeed, the ITC has previously acknowledged as much.

Chr. Bjelland Seafoods, 19 CIT at 43 (citations omitted).

At the very least, the Commission's assertion that Plaintiffs' imports will have a likely discernable impact based on excess capacity is undermined when juxtaposed with the evidence directly preceding the vote day. The court notes that the Commission does not offer a reason, either in the Review Determination or during oral argument, to exclude this evidence beyond the mere assertion that full year data is more probative of future import behavior in the instant case.[6]

---

[6] During oral argument, Government counsel offered the unsupported assertion that because capacity utilization data varies between quarters, partial yearly figures should be excluded. The court notes that, contrary to the Commission's assertion during oral argument that evidence concerning German excess capacity outside the period of review was entirely unsolicited, the German Producers furnished such evidence, at least in part, in response to the Commission's own questionnaires. See German Group Response to Commission Written Questions of September 29, 2000 at 13.

Hence, upon remand, the Commission must address this evidence and clarify its basis for excluding the evidence if it continues to do so.

**a**

**French Producers**

Relying on the data during this period, the Commission points to declining utilization and increasing excess capacity for the French as a proper basis for cumulation and its decision not to revoke the subject orders. The Commission offers this analysis: "[a]lthough French subject producers had reported capacity utilization rates over [ ] percent in 1997 and 1999, capacity utilization rates had declined by [ ] percent from [ ] to [ ] percent during that period. Capacity utilization rates were [ ] in 1999, down [ ] percent from 1998." Defendant's Opposition at 18 (citing Staff Report INV-X-221 (Oct. 18, 2000) ("Staff Report") at CORROSION Table IV-4).

With French capacity utilization exceeding [ ] percent and no discussion of the French data, the court fails to see how the Commission could logically lump the French Producers with all the producers under review based on its assertion that the average capacity utilization exceeded [ ] percent. As the French Producers state, "[a] country with [ ] excess capacity obviously can increase production and ship its goods anywhere; but a country with [ ] excess capacity (as the French Producers had at the end of the POR), just as obviously cannot." Reply Brief of Plaintiffs Usinor, Beautor, Haironville, Sollac Atlantique, Sollac Loraine, and Usinor Steel Corporation ("French Reply") at 10. Indeed, at the end of the POR, French capacity was [ ]. See Staff Report at TABLE CORROSION-IV-4.

The Commission presents the court with a host of post hoc rationales and speculative

theories why the ultimate conclusion in the Review Determination is warranted.  For example, the Commission makes the argument that if French demand were far outpacing capacity "it would seem logical that French subject producers would make plans to increase their capacity significantly." Defendant's Opposition at 19.  In addition, the Commission also states "there was evidence that French and European demand was softening." Id. at 20.  Moreover, the Commission simply declares that much of the French Producers' evidence regarding capacity utilization "is far from disputed," and makes the assertion that "the domestic producers presented evidence that these high capacity figures may not accurately reflect French capacity utilization rates." Id. at 19 (footnotes omitted).  If evidence existed, the Commission should have properly included it as part of a greater analysis of the French Producers' data in its sunset review.  However, the Commission failed to do so and cannot expect to cure the absence of this discussion with unsubstantiated refutations during judicial review.[7]

An agency determination must be supported by concurrent  agency reasoning and not by post hoc reasoning by the agency or its counsel.  Indeed, the Supreme Court has said that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfg. Ass'n of the United States v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 50, 12 L. Ed. 36 (1983).

As a result, the court finds the Commission's decision to cumulate French imports, in light

---

[7] The court is particularly troubled by the late appearance of these counterarguments, given the French specific information submitted to the Commission prior to this action.  This includes evidence that France is a growing net importer of CRCS, that French Producers have in fact requested customers to cancel orders due to overwhelmed capacity, and that according to U.S. customs data, French prices averaged and peaked far higher than domestic like product prices. See French Reply at 3 (citing internal French Producer communications, French Motion, Attachment 4, Exhibit 9; French Producer's Opening Memorandum at 14).  None of this facially

of its treatment of the French capacity utilization data, unsupported by substantial evidence. If it still wishes to cumulate French CRCS on remand, the Commission must properly address this data and sufficiently demonstrate its reasoning.

**b**

**German Producers**

Similarly, the Commission, in determining that German Producers had significant excess capacity, failed to address key evidence demonstrating a marked increase in capacity utilization during the second and third quarters of 2000 as well as the foreseeable future. The Commission claims German capacity utilization rates were properly examined from 1997 to the first quarter 2000, and that the German Producers are incorrectly seeking to override a legitimate exercise of agency discretion, stating "[i]t was quite reasonable for the Commission to rely on full-year figures to more probative for predicting future utilization rates than the partial 2000 figures presented by German subject producers." Defendant's Opposition at 22. Although there was excess capacity during the period reviewed, this alone does not absolve the Commission from examining material evidence to the contrary. The record evidence does demonstrate intermittent excess German capacity, with utilization rates of [ ] percent in 1997, [ ] percent in 1998, and [ ] percent in 1999, [ ] percent in interim January-March 1999, and [ ] percent in interim January-March 2000, existed. See Staff Report at CORROSION Table IV-5. Against this backdrop, the Commission argues that "[g]iven the essential nature of high capacity utilization rates, the Commission reasonably found that subject producers possessed the incentive to increase their

persuasive evidence is mentioned or rebutted in the Review Determination.

subject imports to the United States in the absence of restraining effects of the orders," and that "in the original investigations, despite comparable high capacity utilization rates, German subject producers shipped ever increasing volumes of LTFV imports to the U.S. market," in its Opposition Brief. Defendant's Opposition at 23. This conclusion ignores evidence submitted by the German Producers demonstrating a marked upswing in capacity utilization during the last two quarters of 2000 and projections that German capacity would be very strained for the foreseeable future, even with no upswing in exports to the United States.[8]

As a result, and for the same reasons articulated in the preceding discussion of French capacity utilization, the court finds the Commission's decision to cumulate German imports, in light of its treatment of the German capacity utilization data, unsupported by substantial evidence. In its remand determination, the Commission must properly address this data and include a greater discussion of its reasoning, including a more fully articulated rationale for relying on full year figures, if the Commission still chooses to exclude data outside the period of review.

**3**

**Though It is Not Statutorily Required to Respond to Each Piece of Evidence Presented by the Parties, The Commission Cannot Ignore Evidence that Materially Undermines Its Findings and Conclusions**

The Commission repeatedly, in response to the French and German Producers' allegations that it failed to consider or respond to evidence strongly militating in favor of decumulation,

---

[8] The German Producers provided various projections to the Commission that German mills would be operating at full capacity for the "foreseeable future." The Commission apparently did not consider any of this evidence. See, e.g., SR Con at PLATE-II-7-8 (September 2000 World Economic Outlook); GG DOC. APP. 9/22/00, at exhibits 11, 12, 13, 21, 22); GG Q. RES.

invokes Dastech Int'l, Inc. v. USITC, 21 CIT 469, 963 F. Supp. 1220 (1997), for the proposition that "[t]he ITC or [Commission] is presumed to have considered all the evidence in the record." Id. at 1226. In fact, the Commission appears to employ Dastech as a talismanic justification for the total absence of any specific discussion regarding either the French or German imports.

Citations to the Dastech proposition are found throughout the Commission's opposition brief. See Defendant's Opposition at 11, 18, 24, 29. The Commission first prefaces its overall approach to the German and French data, defending any missing "detailed discussion for subject imports from each of the six subject countries." Id. at 17. It states that "[t]he question is not the precise manner in which the Commission presented the reasons for its determination but whether it considered subject imports from each country and its finding [sic] are supported by substantial evidence." Id. As such, the Commission attempts to refute the Plaintiffs' evidence with unsupported assurances that the relevant data has been considered and factored into what it alleges to be a persuasive Review Determination amply supported by substantial evidence. For example, with regard to the German Producers' submitted projections of German capacity utilization rates, the Commission states that "although the Commission did not mention these 'projections,' it does not mean that they were not considered." Defendant's Opposition at 24 (citing Dastech Int'l, 21 CIT at 475, 963 F. Supp. at 1226). In addition, regarding the Plaintiff's submission of data concerning the overlap of competition between the subject imports, the Commission again states that there is no statutory requirement for a separate discussion on this matter and that "[r]egardless of whether specific evidence is discussed, '[t]he [ITC] is presumed to have considered all [of] the evidence in the record.'" Id. at 29 (quoting Dastech Int'l, 21 CIT at

9/29/00; GG 10/27/00, at 3 – 4, 6, 11 –13.

475, 963 F. Supp. at 1226).

Regardless of any presumption in its favor, the Commission is in no way absolved under Dastech of its responsibility to explain or counter salient evidence that militates against its conclusions. The court is troubled by the repeated generic invocation of Dastech as a shield against examination of the Commission's failure to present required analysis of the record evidence. Dastech prefaces its entire discussion of this presumption with the requirement that the ITC present a "'reviewable, reasoned basis'" for its determinations and added that "[e]xplanation is necessary, of course, for this court to perform its statutory review function." Dastech Int'l, 21 CIT at 475, 963 F. Supp. at 1226 (quoting Bando Chem. Indus., Ltd. v. United States, 17 CIT 798, 799 (1993). Moreover, Dastech cites Granges Metallverken AB, 13 CIT at 478, which states that "it is an abuse of discretion for an agency to fail to consider an *issue* properly raised by the record evidence" though there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties. Id. (emphasis added) (citing Timken Co. v. United States, 10 CIT 86, 97, 630 F. Supp. 1327, 1337-38 (1986), rev'd in part, Koyo Seiko Co. v. United States, 20 F. 3d 1156 (Fed. Cir. 1994)). Dastech also cites Roses, Inc. v. United States, 13 CIT 662 (1989), which indicates that the presumption the agency has considered all the evidence is rebuttable and that "the burden is on the plaintiff to make a contrary showing." Id. at 668 (citations omitted).

Moreover, the Commission's responsibility to answer to evidence that undermines the Commission's findings and conclusions has recently been reiterated by the court in ALTX, Inc. v. United States, 167 F. Supp. 2d 1353 (CIT 2001). In that case, the Commission was made aware of certain key evidence, but declined to discuss it, instead including only superficial mention of

that evidence in its final determination. This court ultimately found the determination

unsupported by substantial evidence:

> The Final Determination merely cites to record evidence containing data on subject import indicators throughout the POI. This off-handed reference to annual data cannot, by itself, constitute an acknowledgment of Plaintiffs' arguments, much less a reasoned explanation for discounting them, as the statute requires. Furthermore, whatever discretion the Commission may have to reject deliberately the conclusions found in the agency's Staff Report, it may not through its silence simply ignore a Staff Report analysis that contradicts the Commission's own conclusions where an interested party has specifically brought the possibly conflicting evidence to the agency's attention . . . .

Id. at 1359 (emphasis added).

> While the ITC need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions. When considered individually, every discrepancy discussed here might not rise to the level of requiring reconsideration of the overall disposition, but taken as a whole, the court finds that the ITC decision is not substantially supported and explained.

Id. at 1373 (emphasis added)(footnotes omitted).

As in ALTX, the evidence here is not peripheral or ancillary to the Commission's

determination. Rather, it has direct and material bearing on the proper resolution of the various

issues presented to the Commission, and it calls the accuracy and legitimacy of the Commission's

findings and conclusions squarely into question. As a result, unsupported assertions that this

evidence was addressed and considered without greater discussion in the Review Determination

is unsatisfactory and the Commission cannot rely on the presumption set forth in Dastech to avoid

its obligations. While a foolish consistency may be the hobgoblin of little minds, every party

before an agency of the United States has a right to expect a fair and logical determination

containing as much analysis as is necessary to adequately demonstrate the basis for its

conclusions.

28

**B**

**The Commission's Conclusions Regarding the Overlap of Competition Between the Imports of the Cumulated Nations Are Supported by Substantial Evidence**

In addition to satisfying the no discernable impact standard, the Commission must also determine that "a reasonable overlap of competition" exists between imports from different countries and with the domestic like products. Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989). The Commission states that it generally considers four factors to determine whether competition overlap is likely: (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product; (2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market. See Review Determination at 23 (citing Wieland Werke, 13 CIT at 563).

The Commission correctly points out that it is "not required to exhaustively explain how each of the factors that it considered led to its conclusion that the subject imports would likely compete under similar conditions of competition." Defendant's Opposition at 28 (citing Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369-70 (Fed. Cir. 1988) ("An explicit explanation is not necessary, however, where the agency's decisional path is reasonably discernable.")). Indeed, the Plaintiffs do not take issue with this general proposition, but instead attack the factual basis of the Commission's findings regarding the above factors. The court concludes that the thread of the Commission's analysis is discernable and the Plaintiffs do no

more than engage in a reweighing of the evidence.

**1**

**The Commission's Conclusions and Reasoning Regarding Fungibility of the Subject Imports is Supported by Substantial Evidence**

The Commission held that the subject imports are entirely interchangeable with the domestic like product. The Commission "found that subject imports and the domestic product are essentially fungible. In the original investigations, domestic producers and importers reported that the domestic and imported products were broadly interchangeable and purchasers frequently reported that domestic corrosion-steel and imports from each subject country were comparable, including subject imports from France and Germany." Defendant's Opposition at 32 (footnotes omitted). Indeed, the Commission relying on clear statements and tables makes the basis for its conclusion highly discernable in the Review Determination:

> In these reviews, the record indicates that domestically produced and imported corrosion-resistant steel are essentially fungible products. Both share the same essential chemical and physical properties. U.S. mills producing and selling corrosion-resistant steel reported that domestically produced and imported products are used interchangeably. Additionally, a majority of importers also reported that domestically produced and imported corrosion-resistant steel are broadly interchangeable.

Review Determination at 72 (citing Staff Report at CORROSION-I-16-18 and CORROSION-II-18-19).[9] Hence, the court concludes that the Commission's fungibility findings are substantiated.

_____

9 Although the French assert their imports should be differentiated as "niche" products, the original determination found that imports from nearly all the subject countries include some niche products. Id. (citing Original Determination at 172-173).

30

**2**

**The Commission's Conclusions Regarding Channels of Distribution for the Subject Imports Are Supported by Substantial Evidence**

The Commission found that both domestic product and subject imports "moved in similar channels of distribution." Id. at 33. According to the Commission, the record evidence demonstrates that the "majority of both the domestic like product and imported product is sold to distributors, service centers/converters, and manufacturers/end users and that both are used in the automotive, industrial and construction industries." Defendant's Opposition at 33 (footnotes omitted). This discussion is also clear and the evidence upon which it is based is readily ascertainable:

> The vast majority of U.S. produced and imported corrosion-resistant steel was sold to distributors, service centers/converters, and manufacturers/end users. Both the domestic and imported product are used in the automotive, industrial and construction industries, with about 40 percent of corrosion-resistant steel being used by the automotive industry.

Review Determination at 73 (citing Staff Report at CR at CORROSION-II-1).[10]

The Commission's reasoning and supporting evidence are readily discernable. Hence, the court concludes that the Commission's channels of distribution findings are substantiated.

---

[10] Although the German Producers assert, citing Commissioner Askey's dissent, that German products are channeled, to a greater extent, to automotive end users as opposed to distributors and end users in construction related industries, the Commission sufficiently demonstrates that this fact alone does not isolate German imports from other imports under review. The Commission could have reasonably concluded that based on the "consolidation of purchasing power in the automotive industry, with end users having their own distributors and service centers," Review Determination at 73, 75, that this distinction does not erase the distribution channel overlap between German imports and other imports. See Defendant's Opposition at 34.

**3**

**The Commission's Conclusions Regarding Simultaneous Market Presence and Geographical Overlap for the Subject Imports Is Supported by Substantial Evidence**

The court finds that on the basis of the previous two factors the Commission's conclusion regarding geographical overlap is supported by substantial evidence. The Commission could reasonably conclude that since the domestic and imported products are used in the same sectors, there is most likely a geographical overlap as well. See Review Determination at 73. Moreover, it is established that the subject imports have been in the United States simultaneously since the imposition of the orders. Id.[11]

**C**

**The Commission's Conclusions Regarding the Conditions of Competition Are Supported by Substantial Evidence**

The conditions of competition section focuses on describing the landscape of corrosion-resistant steel consumption and is based primarily on data culled from importer and producer respondents. See Review Determination at 74-78. The section details the end uses of corrosion steel, factors that influence purchasing decisions, and the general upswing in demand for such products from 1997-1999.

The Commissions findings in this part of its analysis are not in dispute, and its conclusions are clear. Accordingly, the Commission's determination regarding conditions of competition is

---

11 In any case, the Plaintiffs do not dispute the Commission's findings with regard to this factor.

supported by substantial evidence.

## D

## The Commission's Findings Regarding the "Weakened" Condition of the Domestic Industry Are Supported by Substantial Evidence

Both Plaintiffs attack the Commission's determination that the domestic industry is in a weakened state. While the French Producers accuse the Commission of having a skewed perspective stemming from a misplaced desire to protect the overall domestic steel industry, the German Producers take issue primarily with the Commission's findings given the observation that the domestic industry's recovery is an "American success story" as an admission that the industry is in fact stronger than ever. However that observation, made by counsel for the domestic industry, must be read in context:

> This is in an American success story, a win for the international trading system, which condemns dumping and seeks to curb subsidies. But the end of the story is not yet written. Our industry is in trouble . . . . They're at risk. Their market capitalization has dropped by 40 percent since the beginning of this year. Bankruptcies have occurred, and still more companies are in jeopardy. The return on investment on corrosion resistant mills is declining sharply and is now unacceptable . . . . This industry is highly vulnerable.

Transcript of Public Hearing of September 13, 2000 ("Tr.") at 45. This is not the portrait of a healthy industry, but rather a plea for the continued protection of that industry. Although the industry may have enjoyed significant benefits from the imposition of the subject antidumping orders, the statement above says only that they are not enough.

The French Producers argue that the Commission's conclusions regarding the state of the

domestic industry were erroneously guided by "what it characterized as the need for CRCS to serve as a 'profit center' . . . ." French Motion at 18. The French Producers argues that this bias produced a vulnerability conclusion that "flies in the face of the record evidence." Id. (footnotes omitted).

In support of their argument, the French Producers offer their own reading of the record evidence, which, according to them, reveals a domestic industry that is benefiting from sharply growing demand. The French cite domestic CRCS industry figures that indicate expanding capacity and profitability. For example, they point out that CRCS demand has surged as a result of CRCS usage in the United States automotive, construction, and appliance industries, stating that "[i]ndependent forecasts show that demand is likely to grow by nearly 6.3% in the North American market in 2001. . ." Id. at 19. The French Producers also claim that "[w]ith demand and capacity utilization rates sharply up, the U.S. industry has been investing heavily in new CRCS production (at an average of $[ ] million for each full year of the POR) . . . . [and] plans to continue its record investments in future CRCS capacity to cope with increasing demand. . . ." Id. at 20 (footnotes omitted). The French Producers also cite increases in the profitability of the domestic CRCS industry, stating that "[t]he operating income of the U.S. industry averaged [ ] during the POR, which amounted to an aggregate operating income of $ [ ]" Id. at 20-21 (footnotes omitted). Insisting that none of this evidence was disputed, the combination of these figures, according to the French Producers paints a robust portrait of the domestic industry that undermines the Commission's vulnerability determination.

Thus, they surmise the Commission's conclusion was unduly motivated by "misplaced concerns about the health of the steel industry production and sales of material other than the 'domestic like product.'" Id. (emphasis in original). In short, the French accuse the

34

Commission's vulnerability analysis of incorrectly focusing on the welfare of the overall domestic steel industry as opposed to the CRCS domestic industry. They argue "[b]y doing so, the Commission ignored the very function of a sunset review, which is to assess the prospective impact of subject merchandise on the U.S. industry's production and sales solely of the 'domestic like product' – not other steel products." Id. at 22 (citing 19 U.S.C. § 1675a(2) (1999)) (emphasis in original).

In fact, however, the Commission based its decision on record evidence that sharply contradicts the figures proffered by the French Producers. While the French Producers focus exclusively on the gross trends in the industry (i.e., generally increasing profits and capital expenditures), they fail to deal with the industry's declining operating margins. For example, the Commission makes clear that:

> While net sales volumes and values increased from 1997 through 1999, operating income decreased continuously from 1997 to 1999, by a total of $[ ] million. Capacity utilization levels fell from [ ] percent in 1997 to [ ] percent in 1999. Per-short-ton sales values and [Cost of Goods Sold] for the combined domestic producers decreased for the same period but unit sales values decreased more than the decline in total unit costs. Operating profit margins, which are critical to the ability of corrosion-resistant steel firms to remain in operation and to make necessary investments, dropped by almost half, from [ ] percent to [ ] percent. Moreover, comparison of the interim periods of January-March 1999 with January-March 2000 show further decline in a number of key financial indicators, including unit net sales values, operating income, and operating income margin.

See Defendant's Opposition at 40 (citing Staff Report at CORROSION-III-6; Staff Report at CORROSION-III-13; Staff Report at Table CORROSION-III-1; Staff Report at Table CORROSION-III-6; Staff Report at Table CORROSION-III-7). The French Producers do not address this aspect of the domestic industry's condition. As the Commission demonstrates, the continued viability of an industry with rapidly declining profit margins is in question. Moreover,

the Commission clarifies the domestic industry's expansion in capacity was merely designed to meet the shift in demand from electro-galvanized CRCS to "hot-dipped" CRCS, as indicated by testimony by the domestic industry. Defendant's Opposition at 42 (citing Tr. at 50). Similarly, the French Producers erroneously premise their analysis on the time frame during which the subject orders were in effect. As the Commission stresses, the French Producers fail to grasp the Commission's statutory duty to "carefully assess *current* trends and competitive conditions" in gauging vulnerability. Defendant's Opposition at 41 (emphasis in original). In contrast, the French Producers juxtapose the domestic industry in 1999, the final year of the period of review, with the domestic industry in1992, the year prior to the subject orders going into effect. In other words, "Plaintiff's arguments show nothing more than the domestic industry's ability to recover when shielded from unfair trade practices." Defendant's Opposition at 41. Indeed, the SAA echoes this proposition and expressly warns against concluding that there is no possibility of continued or recurring injury simply based on improvement following the imposition of an order.[12]

Hence, the court finds that based on substantial evidence before the Commission, it could reasonably conclude that the domestic industry was in a weakened state.

**E**

**The Commission's Findings Regarding Volume, Price, and Impact of the Cumulated Imports Are Not Supported by Substantial Evidence**

---

[12] "The Commission should not determine that there is no likelihood of continuation or recurrence of injury simply because the industry has recovered after the imposition of an order . . . because one would expect that the imposition of an order . . . . would have some beneficial effect on the industry." SAA at 884.

In addition to challenging the Commission's cumulation decision, the Plaintiffs take issue with the final conclusions of the Commissions' sunset review. In sunset reviews, the Commission ultimately determines whether revocation of antidumping or countervailing duty orders is likely to lead to a continuation or recurrence of material injury to the domestic industry. See 19 U.S.C. § 1675a(a)(1). Under the statute, the Commission analyzes the likely volume, price effect and impact of subject imports if the orders are revoked. See Id. Sunset reviews are prospective in nature, requiring the Commission to engage in "a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo—the revocation or termination of a proceeding and the elimination of its effects on volumes and prices of imports." SAA at 884. The Commission is directed to 1) take into account its previous injury determination; 2) assess whether any improvement in the state of the domestic industry is related to the order or to the suspension agreement under review; and 3) assess whether the industry is vulnerable to material injury if the order is revoked or the suspension agreement is terminated. See 19 U.S.C. § 1675(a)(1). Hence, the Commission's analysis is inherently predictive in nature and relies on previous findings.

**1**

**The Commission's Volume Findings Are Not Supported By Substantial Evidence**

In finding that volume would likely be significant in the absence of the orders, the Commission noted that during the original investigations, the volume of the subject imports increased overall and that these imports dropped significantly following the issuance of the orders. Defendant's Opposition at 34. The Commission's conclusion was heavily grounded on its

findings regarding excess capacity in the cumulated nations:

> In 1999 estimated corrosion-resistant steel production capacity for the subject imports was [ ] million short tons. Total production capacity in the subject countries was greater than U.S. apparent consumption for 1999 of [ ] million short tons, a total even more significant considering that additional capacity of 5.1 million tons currently used to produce non-subject corrosion-resistant steel (such as microalloy) can also be used to produce the subject merchandise.

Review Determination at 79 (citing Staff Report at CORROSION-IV-5, 6, Supplemental Memorandum INV-X 1999 at Tables CORROSION IV-4, 5, 6, and 7; Supplemental Memorandum INV-X-229 at Tables RES-SUPP 2, 3, 4, 5, and 6). The Commission found that coupled with the "incentive to utilize production capacity due to high fixed productions costs, the Commission found subject producers were likely to commence significant exports to the United States upon revocation of the orders." Defendant's Opposition at 35.

Since the court deems the Commission's findings regarding Plaintiffs' excess capacity to be unsupported by substantial evidence and the Commission's volume findings are similarly unsupported. The Commission's findings of likely volume in the absence of the subject orders is heavily reliant on the notion that the Plaintiffs have capacity to spare; that conclusion cannot stand alone.

In addition, it is incongruous for the Commission to assert that the Plaintiffs are "export oriented" without sufficiently considering their export relation to the European Union ("EU" or "EC"). The Commission states:

> The European Community was in existence for some time prior to the original investigations, although further steps at integration and expansion have taken place since the original investigations. While these steps could have the potential to reduce to some degree exports of EU countries to the United States compared to the original investigation, we are not convinced that there has been a shift of such a fundamental nature as to make significant exports to the United States unlikely. With respect to adoption of a common currency, we believe that it is too

early to judge its likely effects on trade outside the EU.

Review Determination at 39, n.155. However, this appears to be in direct conflict with the Commission's analysis in Stainless Steel Plate from Sweden, Inv. No. AA 1921-114 (review), USITC Pub. No. 3204 (July 1999), wherein it concluded that Swedish steel imports would not lead to the recurrence of material injury based, inter alia, on its finding that the producer's "primary marketing focus is, an will continue to remain, the European market." Moreover, in Pressure Sensitive Tape from Italy, Inv. No. AA1921-167 (Review), USITC Pub. No. 3157 (February 1999), the Commission observed that the European Union member states "have significantly integrated their economies within the EC 1992 initiative and the recent adoption of a common currency, the euro" in support of its conclusion that the producer under review would constrain its exports to the EU.

Although each sunset review must be based on the particular set of facts before the Commission, the Commission may not disregard previous findings of a general nature that bear directly upon the current review. The Commission correctly asserts that:

> "each injury or investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation."

Defendant's Opposition at 25 (quoting USEC, Inc. v. United States, 132 F. Supp.2d 1, 14 (CIT 2001) (quoting U.S. Steel Group v. United States, 18 CIT 1190, 1213, 873 F. Supp. 673, 695 (1994)). However, contrary to the Commission's interpretation, the German Producers do not assert that the "Commission is bound to reach the same result that was reached in other investigations, involving other products and other factual circumstances." Id. Rather, the quoted observations regarding EU markets are general in nature and do not depend on the specific

products at issue.

Although the court is aware that the EU market dynamics for CRCS products may be vastly different from its dynamics in the cited determinations, the Commission's discussion fails to make any such distinctions and it appears to contradict itself. Here, the German Producers have submitted uncontraverted evidence that over [ ] percent of its exports were absorbed by the EU and Germany during the POR. See Report by Ekhard Leitner on the "German Cold Rolled and Corrosion Resistant Steel Industries in 2000 and Beyond" at 30-31 (originally attached to German Groups' Prehearing Brief on Cold Rolled Products). As such, the Commission must explain why, in light of its past determinations, the increased market coordination of EU member states that the Commission has acknowledged in the past is not likely to offset potential imports to the United States in this instance.

**2**

**The Commission's Price Effect Findings Are Not Supported By Substantial Evidence**

The Commission found that in the event the subject antidumping orders were lifted, the domestic industry would suffer from adverse price effects. In short, the Commission contends that the various producers under review would aggressively price their imports, through underselling, price depression, and price suppression, which the Commission also contends would arrive in heavy volume. See Review Determination at 81-83. Most importantly, the Commission, in addition to finding the subject imports to be highly interchangeable with the domestic like product, found that price was a significant factor in the purchasing decisions of domestic CRCS consumers. Id.

The Commission stresses its findings of pricing trends made during the Original Investigation and its duty to factor those findings into its predictive analysis of price trends in a sunset review. The Commission points to its Original Review findings that the price of the subject imports declined at a faster rate than domestic like product, in conjunction with increases in volume. In addition, the Commission found that there was significant overselling and under selling of subject imports. See Original Determination at 190-91.

Hence with regard to the German Producers, the Commission is justified in relying more heavily upon its previous findings than upon the pricing data submitted by the German Producers covering the POR. It may be true that the German Producers did not resort to aggressive pricing measures during the POR, however, this is not necessarily more probative of future behavior. Since, as discussed, the Commission is tasked with predicting the characteristics of importer behavior in the absence of the subject antidumping orders, it logically based its findings regarding price impact upon its previous determination, where it observed importer pricing behavior in a mirror environment.

Nonetheless, the Commission's price effect findings are unsupported by substantial evidence; they do not logically follow from the Commission's flawed volume analysis. The relationship between the imports' potential price effect and their volume is obvious. If, as the Plaintiffs argue, the potential import volume is truly limited due to strained capacity, then the attendant price effects cannot be as pronounced as the Commission argues. Accordingly, the Commission cannot justifiably rely on its previous price effect findings alone. Rather, upon remand the Commission must reassess the potential price effects in a manner that takes into account the Commission's revised volume analysis.

41

**3**

**The Commission's Conclusions Regarding the Impact of the Subject Imports Though Not Inherently Flawed Cannot Stand Without the Other Subsidiary Findings**

The Commission's findings regarding the impact of potential imports from the subject countries were largely predicated upon its assessment of the domestic industry's weakened condition. See Review Determination at 83-86. As discussed, the Commission found that the domestic industry, despite the positive impact of the orders is still in a very precarious economic position warranting continued protection. Id. As discussed, the court does not find fault in this portion of the Commission's review determination. Therefore, the court concurs with the Commission's impact finding to the extent that it stems from its domestic industry assessment. Given the sensitive nature of the domestic industry's condition, the Commission could reasonably find that significant increases in import volumes coupled with price declines would lead to significant injury. It is similarly reasonable to predict that such trends would "have a direct adverse impact on the industry's profitability as well as its ability to raise capital and make and maintain necessary capital investments." Id. at 86.

However, this component of the Commission's analysis cannot stand in the absence of the other subsidiary components of the Commission's analysis. In short, the actual impact the weakened domestic industry may face is obviously connected to the actual volume of the subject imports. Therefore, although the domestic industry is in a weakened state, the likely volume of potential imports has not been sufficiently established. As a result, the potential injury about which the Commission warns is insufficiently supported.

42

**4**

**The Commission Has Not Demonstrated that the Outcome it Predicts if the Subject Orders Are Lifted is "Likely"**

The Commission's analysis of production capacity, among other things, may also be premised on an improper construal of the statutory term "likely," which is not expressly defined. The Commission's reliance on the SAA, does not clarify whether the Commission's predicted outcome is merely possible as opposed to probable. The Commission asserts that "[t]he mere existence of contrary evidence or the possibility of 'more than one likely outcome,' does not mean that the Commission's determination is in error," Defendant's Opposition at 20-21, the Commission cites the SAA:

> The determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

SAA at 883.

The Federal Circuit has previously held that "undefined terms in a statute are deemed to have their ordinarily understood meaning." Koyo Seiko, 36 F.3d at 1571 n.9. Resort to dictionary sources Webster's Dictionary and Black's Law Dictionary demonstrates that "likely" is tantamount to "probable," not merely "possible." See Webster's Ninth New Collegiate Dictionary, at 692 (1990); Black's Law Dictionary (6th ed., 13th reprint) at 834 (1998). Under the standard articulated in Chevron, the court concludes that the meaning of the term is clear and

terminates its inquiry there.[13]

Certainly, as the SAA says, multiple "likely" outcomes are possible under the statute. The Commission, however, must demonstrate that its interpretation of the evidence is one of them. The Commission, relying solely on the above passage in support of its meager discussion of the Plaintiffs' evidence, does not demonstrate how its understanding of the impact and scope of potential future imports are more than one possibility, as opposed to one likelihood, among many. The court remands the matter to the Commission to determine, in the manner required by law, whether the recurrence or continuation of injury is likely, based on a more complete explanation of its findings.

## V
## CONCLUSION

The Review Determination is remanded to the Commission. To withstand judicial scrutiny, the Commission must sufficiently articulate the basis of its conclusions. In particular, the Commission must address the Plaintiffs' evidence regarding capacity utilization and the impact of the EU. As the Supreme Court says, the basis for the Commission's determination cannot be hidden, an administrative agency must disclose the basis of its order, clearly indicating that it has not overstepped the bounds of its discretion. Burlington Truck Lines v. United States, 371 U.S. 156, 167-68, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962).[14] The Commission must discuss the

---

[13] The court came to the same conclusion regarding the same statutory term in Usinor Industeel, et al. v. United States, et al., No. 01-0006, Slip-Op 02-39 (CIT 2002).

[14] This is particularly true, where, the agency is engaged in activities with broad potential impact. Here, the questions at issue are not relevant only to the parties. Rather, in the larger sense, they relate to the willingness of the United States, through its agencies, to fulfill its freely assumed

44

key issues in its determination and is not free to simply leave the parties or the court to guess whether these issues were properly factored into the Commission's analysis. See, e.g., SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S. Ct. 454, 87 L. Ed. 626 (1943). In addition, the Commission must further discuss its obligations under the Antidumping Agreement vis-a-vis 19 U.S.C. § 1675a(a)(7) and must fully explain whether its position can be reconciled with, or unavoidably contradicts, the Antidumping Agreement. Finally, to the extent the Commission determines that its decision to cumulate and the findings on which it is based is no longer valid, it must revise its subsidiary sunset review findings regarding volume, price, and impact of the Plaintiffs' potential imports. Its failure to do so here has resulted in a Review Determination that is unsupported by substantial evidence.

_____
Evan J. Wallach, Judge

Dated: July 19, 2002
New York, New York

---

international obligations. It is the essence of Charming Betsy that such duties are not lightly disregarded. The reputation of this nation as one based on rule of law, not transient individual interest, requires a full and fair analysis within the bounds of the law.